## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI

DALE R. LUDWICK, on behalf of Herself
and All Others Similarly Situated,

                             Plaintiff,

              v.

HARBINGER GROUP, INC., FIDELITY &
GUARANTY LIFE INSURANCE
COMPANY, RAVEN REINSURANCE
COMPANY, and FRONT STREET RE
(CAYMAN), LTD.,

                           Defendants.

Case No.

**CLASS ACTION COMPLAINT FOR:**

1.   FEDERAL RICO VIOLATIONS
2.   DECLARATORY JUDGMENT

    **DEMAND FOR JURY TRIAL**

010342-13  741519 V1

I.      INTRODUCTION ................................................................................................1

II.     PARTIES AND RELATED PLAYERS.............................................................7

III.    JURISDICTION ..................................................................................................10

IV.     GENERAL ALLEGATIONS .............................................................................11

        A.      The Insurance Company Model:  Short-Term Cash, Long-Term
                Obligations .................................................................................................11

        B.      Insurance Companies and Hedge Funds:  A Culture Clash .................12

        C.      Statutory Accounting Requirements Are Designed to Protect Annuity
                Holders ........................................................................................................14

        D.      Relevant Statutory Accounting Principles ............................................17

                1.      Fundamental Principles of Conservatism and Disclosure. ........17

                2.      Annual and Quarterly Reporting Requirements. ......................18

                3.      Insurer Dealings with Affiliated Entities. .................................19

                4.      Reinsurance Transactions. ..........................................................21

                        a.      The Way Reinsurance Is Supposed to Work. ...............21

                        b.      The Way Reinsurance Can Be Abused. ........................23

                5.      The Fraudulent Use of Captives in Reserve Discounting. .........26

V.      DEFENDANTS' FRAUDULENT SCHEME ....................................................32

        A.      Harbinger's Acquisition of F&G Insurance ..........................................32

        B.      F&G Insurance Has To Reclaim Ceded Liabilities from OM Re ..........34

        C.      F&G Insurance's 2011 Captive Reinsurance Transaction with Raven
                Re .................................................................................................................35

        D.      F&G Insurance's 2011 Reinsurance Transactions with Wilton Re ......37

        E.      Defendants' Scheme Continued in 2012 ................................................40

010342-13  741519 V1

       1.      F&G Insurance's 2012 Captive Reinsurance Transactions with Raven Re. .......................................................................40

       2.      F&G Insurance's 2012 Captive Reinsurance Transactions with Front Street Cayman. ..........................................................42

    F.      Summary of Sham Reinsurance Transactions .......................................43

    G.      F&G Insurance's Misstated Asset Values ............................................44

    H.      FGL's 2013 IPO ....................................................................................45

VI.    PLAINTIFF'S PURCHASE OF AN F&G INSURANCE ANNUITY ............46

VII.    RICO ALLEGATIONS ........................................................................................48

    A.      Standing, Injury, and Proximate Cause .................................................49

    B.      The Alleged Associated-in-Fact RICO Enterprise ...............................51

       1.      Purpose of the RICO Enterprise. .............................................52

       2.      Relationships among Separate and Distinct Associates ............52

       3.      Continuous Existence ................................................................58

    C.      Interstate Commerce ..............................................................................59

    D.      Predicate Acts of Racketeering .............................................................60

    E.      Pattern of Racketeering Activity ...........................................................66

VIII.    CLASS ALLEGATIONS ....................................................................................67

IX.    CAUSES OF ACTION .......................................................................................69

    COUNT ONE (Violation Of The Racketeer Influenced And Corrupt Organizations Act, 18 U.S.C. Section 1962(c)) ...................................69

    COUNT TWO (Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Section 1962(d)) ..................................70

    COUNT THREE (Injunctive and Declaratory Relief) ..........................71

PRAYER .......................................................................................................................72

JURY DEMAND ..........................................................................................................72

010342-13 741519 V1

Plaintiff Dale R. Ludwick ("Plaintiff"), by and through her attorneys, files this Complaint against Defendants Harbinger Group, Inc. ("Harbinger"), Fidelity & Guaranty Life Insurance Company ("F&G Insurance"), Raven Reinsurance Company ("Raven Re"), and Front Street Re (Cayman), Ltd. ("Front Street Cayman"), on behalf of herself and all other similarly situated persons who purchased annuity products issued by F&G Insurance since April 6, 2011 ("the Class Period"). Plaintiff alleges the following upon personal knowledge as to herself and her own acts, and as to all other matters upon information and belief, based upon the investigation made by and through her attorneys and expert consultants:

## I.    INTRODUCTION

1.      Hedge funds and private equity funds are loosely regulated, private firms comprised of high net worth and institutional investors. Private equity funds generally attempt to maximize short-term profits through high-risk or aggressive investments.

2.      Life insurance companies by contrast receive cash in the form of premiums while undertaking long-term obligations to annuity holders under the annuity contracts issued to them. Insurance companies must, therefore, take a conservative approach to investing the premium payments they receive, one in which safe investments generate sufficient returns to cover their obligations to their annuity holders. Insurance companies must not only make sure they have adequate reserves and capitalization to meet their current and long-term obligations, they must also ensure that their assets are sufficiently liquid in order to meet those obligations when they become due.

3.      To safeguard annuity holders and ensure that insurance companies honor their obligations to them, insurance companies must follow a unique set of accounting rules called Statutory Accounting Principles ("SAP"), must establish statutory reserves in conformance with

SAP, and must certify that they have assets sufficient to meet both their current and future annuity holder obligations.

4.     Rating agencies, the insurance industry, and regulators generally use two metrics to measure whether an insurance company is adequately capitalized to meet its current and future obligations. One test measures whether the insurance company maintains an adequate surplus (assets minus liabilities), including reserves for future annuity holder obligations; the second measures whether the insurance company's Risk-Based Capital" ("RBC") is adequate to meet the insurance company's obligations given its size and risk profile. Both metrics reflect the conservative nature of annuity products and the long-term liabilities insurance companies assume thereunder, and operate as a tripwire system to identify inadequately capitalized companies that lack a proper margin of safety for annuity holders.

5.     The conflicting objectives of hedge funds and traditional insurance companies collided in this case when Harbinger – a hedge fund controlled by Phillip A. Falcone – swooped in to exploit the insurance holding company model, by acquiring F&G Insurance and using its annuity business as a purportedly cheap source of capital to fund Harbinger's aggressive investment schemes, and also to extract fees and dividends, thereby jeopardizing F&G Insurance's ability to satisfy its long-term obligations to its annuity holders, including Plaintiff.

6.     Annuity sales can place immediate strains on surplus and negatively impact key financial ratios, such as the risk based capital ("RBC"). Consequently, to carry out their goal of rapidly expanding annuity sales and extracting cash from F&G Insurance, Harbinger and Falcone had to create the illusion of surplus where none existed.

7.     To create the illusion of surplus, and thus extract dividends from F&G Insurance, Harbinger and Falcone hatched a fraudulent accounting scheme to hide F&G Insurance's

- 2 -

liabilities and artificially inflate F&G Insurance's reported assets. Defendants' scheme ignored or exploited basic SAP accounting principles designed to protect annuity holders, instead putting existing and prospective annuity holders at risk while falsely representing F&G Insurance's financial stability.

8.      After taking over F&G Insurance, Harbinger and Falcone orchestrated a series of sham transactions using wholly-owned captive special purpose vehicles and a reinsurance company named Wilton Re to off-load F&G Insurance's liabilities from its financial statements.

9.      Throughout 2011, 2012 and 2013, Defendants systematically bounced staggering amounts of F&G Insurance liabilities to and from captive insurers in Vermont and the Cayman Islands as well as to Wilton Re and its Bermuda captive, Wilton Re Bermuda. Each of the transactions created a false appearance of capital adequacy and financial strength for F&G Insurance.

10.     Purporting to move liabilities off an insurance company's books to such captive entities disguises and understates the risks faced by the company; as one retired state insurance examiner stated, "when risk bounces from one entity to another, it often vanishes" from detection by regulators and policyholders. *See* http://www.lifehealthpro.com/2011/11/21/shining-a-light-on-a-shadow-industry-captive-reins.

11.     Defendants' fraudulent scheme, was not, however, limited to hiding F&G Insurance's liabilities through the bogus reinsurance transactions. F&G Insurance also used those transactions to report its massive holdings of risky, non-agency mortgage backed securities ("MBS") in its "admitted asset" base at cost, rather than at their true market value – MBS which are worth hundreds-of-millions of dollars less than reported in the sworn Annual Statements of financial condition filed with F&G Insurance's regulators.

12.    These maneuvers were all designed to manipulate the reported financial condition of F&G Insurance, to give the false impression that its financial strength and surplus was as represented to annuity holders, while at the same time continuing to raise capital by selling large amounts of annuities and paying itself huge dividends and fees, neither of which would be supported by F&G Insurance's true financial condition.  Indeed, in just three years Harbinger and Falcone have extracted dividends from F&G Insurance totaling $120 Million.

13.    Harbinger and Falcone had an additional incentive to falsify the financial condition of F&G Insurance because they were planning a December 2013 initial public offering of stock through Fidelity & Guaranty Life, Harbinger's subsidiary and F&G Insurance's parent ("the 2013 IPO").

14.    Absent Defendants' financial shell games, F&G Insurance would have had to report a ***negative statutory surplus*** after its acquisition by Harbinger, meaning that the assets backing its obligations to its annuity purchasers were necessarily impaired and inadequate.  F&G Insurance's negative surplus condition means that the true present value of its admitted assets is significantly lower than the present value of its immediate and future obligations to Plaintiff and other similarly situated annuity purchasers.  In other words, the risk of long-term nonperformance and default by F&G Insurance is significantly greater than represented by Defendants.

15.    Absent Defendants' financial shell games, F&G Insurance would also have had to report a much smaller RBC ratio.

16.    Under these circumstances, F&G Insurance would have been severely constrained in its ability to sell annuity products and distribute dividends to the affiliated companies

ultimately owned by Harbinger and Falcone. Moreover, admitting F&G Insurance's true financial condition would have unquestionably hurt the stock price during the IPO.

17. Instead of complying with accounting requirements, Defendants chose to maximize Harbinger and Falcone's profits at the expense of annuity holders. Indeed, the purchasers of annuity products from F&G Insurance, who made immediate and ongoing cash premium payments to F&G Insurance in return for its promise of long-term performance, are the most immediate victims of Defendants' schemes. As a direct consequence of Defendants' financial manipulations, Plaintiff and all other similarly situated purchasers were sold annuities that were substantially less valuable than represented, and the account values of the F&G annuities were and are lower than the values that would have been realized absent Defendants' misconduct.

18. An annuity issued by a less financially stable insurance company is significantly and demonstrably *less valuable* than the same product issued by a more financially stable issuer. For that reason, insurance companies marketing their products to potential annuity purchasers emphasize their strong financial condition, typically trumpeting AM Best ratings of their financial strength.

19. F&G Insurance is no exception. Throughout the Class Period, F&G Insurance marketed its annuity products by emphasizing its financial strength, particularly its AM Best rating of "B++," which F&G Insurance says is "[a]ssigned to companies that have a good ability to meet their ongoing insurance obligations."[1] In its "Corporate Spotlight" brochure delivered to Plaintiff (a true and correct copy is attached as Exhibit A), F&G Insurance emphasized not only its "Solid Rating Reviews," including "A.M. Best B++ for financial strength," but also

---

[1] http://home.fglife.com/about-fgl/ratings

represented as of December 31, 2012 a "Statutory Capital and Surplus" of $900 million and an RBC of 406%.

20.     Furthermore, an insurance company's ability to credit interest to fixed-interest annuities or to pass on market gains to equity-indexed annuities is directly linked to the returns realized on the company's portfolio assets.  A company that dissipates surplus through dividends paid to its parent, through investment advisory fees paid to affiliates, or through related-party transactions credits lower interest to annuity account values than would be paid if the surplus was invested in high-quality assets.  Plaintiff and other F&G Insurance annuity purchasers therefore received less valuable contracts paying lower returns as a result of Defendants' profligate practices.

21.     Defendants throughout the Class Period thus fraudulently duped Plaintiff and the Class into buying annuity products based on false representations of F&G Insurance's security and financial strength.  Plaintiff and the Class would not have purchased their annuities had they known the true financial condition of F&G Insurance, purchasing as they did annuity products that are far riskier and thus worth far less at the date of acquisition and thereafter than comparable products issued by financially sound issuers.

22.     Defendants' fraudulent scheme, enterprise and conspiracy constitute violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d).  Plaintiff and the Class have been damaged by Defendants' pattern of racketeering activity because they were misled into purchasing annuities based on material misrepresentations of the financial strength of the issuing company, annuity products that no reasonable person would purchase if not deceived.  This suit is necessary to remedy the injury caused by Defendants' racketeering activity.

## II.    PARTIES AND RELATED PLAYERS

23.    Plaintiff Dale R. Ludwick ("Plaintiff" or "Ludwick") is a resident and domiciliary of Kansas City, Missouri.

24.    Defendant Harbinger Group Inc. ("Harbinger") is a Delaware corporation with its principal place of business at 450 Park Avenue, New York, New York.

25.    Phillip A. Falcone is Harbinger's chairman and CEO.  Falcone is subject to a consent decree with the United States Securities and Exchange Commission ("SEC") barring him from acting as or associating with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization.

26.    Fidelity Guaranty Life ("FGL") is a Delaware corporation with its principal place of business at 1001 Fleet Street, 6th Floor, Baltimore, Maryland.  FGL was formerly known as "Harbinger OM, LLC."  Before the 2013 IPO, Harbinger owned 100% of FGL's common stock. Since the 2013 IPO, Harbinger indirectly owns approximately 80% of FGL's common stock.

27.    Defendant F&G Insurance is an Iowa corporation with its domicile and principal place of business in Des Moines, Iowa.  F&G Insurance is wholly owned by FGL, through Fidelity & Guaranty Life Holdings, Inc ("FGLH").  For many years F&G Insurance was a Maryland corporation with its principal place of business in Maryland.  On November 1, 2013, F&G Insurance was re-domesticated from Maryland to Iowa, and its principal place of business was moved from Baltimore to Des Moines.

28.    Defendant Raven Reinsurance Company ("Raven Re") is a Vermont corporation with its principal place of business at the address of its Captive Manager, Marsh Management Services, Inc., 100 Bank Street, Suite 610, Burlington, Vermont, 05401.  Raven Re is wholly owned by F&G Insurance.

29.     FS HoldCo Ltd ("Front Street Holding") is a Bermuda company with its principal place of business at Sterling House, 16 Wesley Street, PO Box HM 534, Hamilton HMCX, Bermuda.  Front Street Holding is owned by Harbinger.

30.     Front Street Re Ltd. ("Front Street Re") is a Bermuda company with its principal place of business at Sterling House, 16 Wesley Street, PO Box HM 534, Hamilton HM CX, Bermuda.  Front Street Re is owned by Front Street Holding and thus indirectly wholly owned by Harbinger.

31.     Defendant Front Street Cayman is licensed in the Cayman Islands with its principal place of business at Sterling House, 16 Wesley Street, PO Box HM 534, Hamilton HM CX, Bermuda.  Front Street Cayman became licensed by the Cayman Islands Monetary Authority on October 24, 2102.  Front Street Cayman is owned by Front Street Re, and thus indirectly owned by Harbinger.

32.     The relevant part of the Harbinger holding company system is depicted in F&G Insurance's Annual Statement for 2013 as follows:

**SCHEDULE Y – INFORMATION CONCERNING ACTIVITIES OF INSURER MEMBERS OF A HOLDING COMPANY GROUP**
**PART 1 – ORGANIZATIONAL CHART**

| Entity Name* | FEIN | DOMICILE | NAIC |
|---|---|---|---|
| SECTION I – DOWNSTREAM AFFILIATES OF HARBINGER GROUP INC. [1] | | | |
| Harbinger Group Inc. [2] | 74-1339132 | DE | |
| HGI Energy Holdings, LLC | 46-1359348 | DE | |
| EXCO/HGI GP, LLC | 46-1738921 | DE | |
| EXCO/HGI Production Partners, LP | 46-1750174 | DE | |
| EXCO/HGI JV Assets, LLC | 46-1374193 | DE | |
| Vernon Gathering, LLC | 06-1809635 | DE | |
| Fidelity & Guaranty Life | 46-3489149 | DE | |
| Fidelity & Guaranty Life Holdings, Inc. | 48-1245662 | DE | |
| Fidelity & Guaranty Life Business Services, Inc. | 43-1914674 | DE | |
| Fidelity & Guaranty Life Insurance Company | 52-6033321 | IA | 63274 |
| Fidelity & Guaranty Life Insurance Company of New York | 13-1972800 | NY | 69434 |
| Fidelity & Guaranty Life Insurance Agency, Inc. | 52-1387769 | MD | |
| Fidelity & Guaranty Life Assignment, LLC | | MD | |
| Fidelity & Guaranty Life Brokerage, LLC | 52-1830538 | MD | |
| Raven Reinsurance Company | 27-3993835 | VT | 14069 |
| FS HoldCo Ltd. | 98-1068989 | Cayman Islands | |
| Front Street Re Ltd. | | Bermuda | |
| Front Street Re (Cayman) Ltd. | | Cayman Islands | |
| HGI Asset Management Holdings, LLC | 45-3911331 | DE | |
| HGI Real Estate, LLC | | DE | |
| PI Data Holdings, LLC [3] | 45-3137243 | DE | |
| Five Island Asset Management, LLC | | DE | |
| Salus Capital Partners, LLC | 32-0359778 | DE | |
| Salus Capital Partners II, LLC | | DE | |
| HGI Funding, LLC | | DE | |
| North American Energy Partners, LLC [4] | | Canada | |
| HGI Global Holdings, LLC | 46-4233418 | DE | |
| New FOH, LLC | 46-4158739 | DE | |
| Zaldy NYC, LLC | 46-4207457 | DE | |
| Zap.Com Corporation [5] | 76-0571159 | NV | |
| Spectrum Brands Holdings, Inc. [6] | 27-2166650 | DE | |
| SB/RH Holdings, LLC | 27-2812840 | DE | |
| Spectrum Brands, Inc. | 22-2423556 | DE | |
| Baldwin Hardware Corporation | 23-1497042 | PA | |
| Price Pfister, Inc. | 95-3844796 | DE | |
| Kwikset Corporation | 06-1156941 | DE | |
| National Manufacturing Co. | 36-1524190 | IL | |
| National Manufacturing Mexico A, LLC | n/a | DE | |
| National Manufacturing Mexico B, LLC | n/a | DE | |

33.     Wilton Re U.S. Holdings, Inc. ("Wilton") is a non-insurance holding company domiciled in Delaware and is the direct parent of Wilton Reassurance Company.  It is the wholly owned subsidiary of Wilton Re Holdings Ltd., a non-insurance holding company located in Bermuda.

34.     Wilton Reassurance Company ("Wilton Re") is an insurance company domiciled in Minnesota and located at Fifth Avenue Towers, 100 S. 5th St., Suite 1075, Minneapolis, Minnesota, and is the wholly owned subsidiary of Wilton.

35.     Wilton Reinsurance Bermuda Ltd. ("Wilton Re Bermuda") is also a wholly owned subsidiary of Wilton Re Holdings Limited and is domiciled in Bermuda.

36.     The relevant part of the Wilton holding company system is depicted in Wilton Re's 2013 annual statement as follows:

- 9 -

**SCHEDULE Y - INFORMATION CONCERNING ACTIVITIES OF INSURER MEMBERS OF A HOLDING COMPANY GROUP**

**PART 1 - ORGANIZATIONAL CHART**

| | FEIN | NAIC | STATE |
|---|---|---|---|
| Wilton Re Holdings Limited | 98-0473388 | | |
| --Wilton Reinsurance Bermuda Limited | 98-0473393 | AA-3190878 | |
| --Wilton Re U.S. Holdings, Inc. | 32-0132101 | | |
| ----Wilton Re Services, Inc. | 32-0132104 | | |
| ----Wilton Reassurance Company | 41-1760577 | 66133 | MN |
| ------- Texas Life Insurance Company | 74-0940890 | 69396 | TX |
| -------Wilton Reassurance Life Company of New York | 94-1516991 | 60704 | NY |
| -------Redding Re Holdings, LLC | 43-2090153 | | |
| ---------Redding Reassurance Company | 43-2090144 | | SC |
| -------Heritage Union Life Insurance Company | 41-0880965 | 62421 | MN |
| -------Woodstown, LLC | 46-2367864 | | DE |
| ----Dunmore, LLC | 27-5384846 | | DE |
| ----Wilton Re Finance, LLC | 46-2151727 | | DE |

## III.    JURISDICTION

37.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

38.    This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965(a), (b) and (d).  F&G Insurance resides in, is found in, has agents in and transacts its affairs in Missouri.  F&G Insurance in its 2013 Annual Statement reported the generation of $33,796,336 of annuity considerations in Missouri for 2013 alone.  Moreover, all Defendants are associates in and have participated in a fraudulent enterprise designed to hide F&G Insurance's true financial condition in order to market, promote, distribute, and sell the F&G Insurance annuity products in Missouri during the Class Period, such that the "ends of justice" support the exercise of personal jurisdiction over them by this Court.

39.    Defendants' contacts with the United States as a whole satisfy the "minimum contacts" test of *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), such that the exercise of jurisdiction over them is consistent with constitutional due process protections.

40.    Venue is proper in this District pursuant to 18 U.S.C. § 1965(a) and (b), as F&G Insurance resides in, is found in, has agents in and transact its affairs in Missouri.

010342-13  74[1518 X1

41.     Venue in this District is alternatively appropriate under 28 U.S.C. § 1391, because the defendant corporations are deemed to reside in any judicial district in which they are subject to personal jurisdiction, and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## IV.     GENERAL ALLEGATIONS

### A.     The Insurance Company Model:  Short-Term Cash, Long-Term Obligations

42.     An annuity is a contract in which, in exchange for premiums, an insurance company agrees to make a payment or a series of payments to the annuitant or beneficiary in the future.  The value of the annuity to a purchaser is the present value of the projected future stream of payments discounted to reflect, among other things, the risk of non-payment by the insurance company.  Annuity holders thus pay premiums for what is essentially a long-term promise of performance by the insurer.

43.     Annuity products are aggressively marketed to seniors as a way to accumulate account value earnings over time and, ultimately, convert the account values into a stream of future payments guaranteed for a period certain or as long as they live.

44.     Insurance companies, especially annuity companies, receive substantial cash funds in the form of premiums collected from customers at the inception of the underlying annuity policies.  The receipt of these premiums create obligations of long duration.

45.     For the insurance company (or "insurer"), the sale of annuity products creates immediate revenues through premium receipts, but also current obligations (including payment of agent commissions) and long-term liabilities based on the insurer's future performance obligations.

46.     After payment of commissions and other expenses, traditional insurers invest the premium revenues in conservative investment assets designed to ensure their ability to meet their

current, intermediate, and long-term obligations to their annuity holders. Indeed, the strength of an insurance company is measured not by its short-term profits or returns, but by its prospects for long-term financial stability.

## B. Insurance Companies and Hedge Funds: A Culture Clash

47. In contrast to the conservatism and the long-term outlook of the insurance company business model, the private equity and hedge fund model operates with a short-term view of maximizing capital appreciation and income. They generally operate on a total return basis, often through high-risk or aggressive investments, some of which are successful, and some of which are not. The average U.S. private equity firm investment holding period is only about five years.

48. A fundamental building block of the private equity business model is access to substantial amounts of capital (typically cash or cash-equivalents) to fund their investment strategies. Private equity historically has raised this capital from investors or by borrowing, and typically both.

49. Insurance companies by their nature accumulate substantial amounts of capital to meet their long-term liabilities to policy-holders. Believing that these accumulated funds represent a relatively inexpensive alternative source of capital that they can use to fund their business model, private equity firms, such as Harbinger, have begun to acquire insurance companies.

50. The opportunity for private equity firms to exploit the timing difference between the short-term receipt of cash premiums by insurance companies and their long-term performance obligations has rightly become a source of grave concern in the insurance industry. As former Iowa Insurance Commissioner and former head of the NAIC Terri Vaughn has stated: "There's a lot of concern within the industry about the influx of private equity into the insurance

sector. Some people are worried that their business model is to invest in a variety of high-risk opportunities, knowing that some won't turn out. And in our industry, that means policyholders wouldn't get the benefits they've been promised and the rest of the industry would have to share in the losses."

51.     Walter White, CEO of Allianz Life Insurance Company of North America has stated: "The insurance business is a long-term business. For any player to be successful, you have to take that long-term view. The traditional view of private equity is short-term."

52.     In July 2013, the National Association of Insurance Commissioners' ("NAIC") Center for Insurance Policy and Research ("CIPR") published an article articulating insurance industry concerns over the acquisition of insurers by private equity groups, a true and accurate copy of which is attached as Exhibit B. In the article, the authors note that life insurers' long-term obligations and investment horizons mean that "[t]hey focus on asset-liability management, as much as possible, closely matching their assets' duration to that of their longer-term liabilities so that the cash flow streams of the investments are synchronized with when liabilities become due."

53.     The authors point out how, by contrast, "[p]rivate equity-backed life insurance companies, on the other hand, are likely to invest on a total return basis—the percentage gain (or loss) on a security based on the purchase price plus any interest, dividends or other income that may have been received or accrued—in a similar fashion to their parent or affiliated sponsor…. [A] private equity-backed insurer's focus on market value and shorter-term investing is inconsistent with the basis of amortized cost in statutory accounting and the time horizon assumptions for bond investments in the [insurance regulators' Risk-Based Capital] framework, respectively.

54.     The authors of the CIPR article also note the increased risks of transactions with affiliates that lack economic meaning or are not arm's-length, noting that "[o]ther intercompany transactions that can result in taking cash out of the insurance company is the purchasing and selling of securities with another account managed, maintained or trusteed by the asset manager. The concern is that a transaction will be executed at a price other than the current market price, resulting in a potential conflict of interest."

55.     Julie McPeak, chairwoman of the NAIC's Life Insurance and Insurance Committee, has observed how the NAIC has "noticed that there could be inconsistent promises between a private equity firm and beneficiaries of a life insurance or annuity company …. There could be some firms that think there is this nice big pool of assets that they could invest more aggressively than we would be comfortable with."

**C.     Statutory Accounting Requirements Are Designed to Protect Annuity Holders**

56.     The NAIC is the U.S. standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia, and five U.S. territories.  Among the goals included in NAIC's mission statement is to "[p]rotect the public interest" and to "[p]romote the reliability, solvency and financial solidity of insurance institutions."[2]

57.     As an insurer, F&G Insurance is subject to regulation not only by the laws of its state of domicile (Iowa), but also to the state laws and regulations governing the sale of insurance in every state in which it is licensed to do business.

---

[2] NAIC website, at http://www.naic.org/index_about.htm.

010342-13 741518 V1

58.     As an insurer, F&G Insurance is required each year to prepare and file with its insurance regulators a sworn Annual Statement based on the convention blank form promulgated by the NAIC.

59.     The Annual Statement is a detailed statement of an insurance company's finances that must be prepared according to statutory accounting principles ("SAP") set forth in the NAIC Accounting Practices and Procedures Manual ("AP&P Manual") and NAIC Annual Statement Instructions to the extent they are not in conflict with applicable state statutes and/or regulations. Quarterly Statements using SAP are also prepared using the same accounting methodology but containing less detail than the Annual Statement.

60.     The fundamentals of statutory accounting for insurance companies are unique and differ from other financial accounting methods because the focus is on solvency for the protection of annuity holders. This is because insurance contracts, especially annuities, involve a promise to pay extending years (and decades) into the future.

61.     A basic tenet of statutory accounting for insurance companies is conservatism in valuation, accounting and financial reporting to protect policyholders and annuity holders: "Conservative valuation procedures provide protection to policyholders against adverse fluctuations in financial condition or operating results. Statutory accounting should be reasonably conservative over the span of economic cycles and in recognition of the primary responsibility to regulate for financial solvency." AP&P Manual, ¶ 30.

62.     This emphasis in statutory accounting to determine an insurer's ability to satisfy its obligations to annuity holders due years in the future is much different than other financial accounting methods.

63. An insurer's solvency is determined by the surplus it reports in its Quarterly and Annual Statements. Surplus is derived by comparing the company's "admitted" assets to all of its liabilities, including its current and projected future obligations to policyholders and annuity holders.

64. Importantly, "admitted" assets exclude those that are unavailable due to encumbrances or other third party interests; such assets are considered "nonadmitted" and accorded limited or no value in statutory reporting. *See* AP&P Manual, SSAP No. 4.

65. In addition, even though an insurer may be part of a holding company system, the solvency of each insurance company is determined solely by that company's finances independent of the finances of any other affiliated company within the holding company system, often referred to as "Stand Alone" financial statements.

66. The following example of a simplified balance sheet demonstrates how surplus is calculated:

| Admitted Assets | | | Liabilities | |
|---|---|---|---|---|
| Bonds | $13 Billion | | All Reserves | $14 Billion |
| Stock | $ 1 Billion | | Expenses Due | $ 2 Billion |
| Cash | $ 1 Billion | | Debt | $ 0 |
| All Other | $ 2 Billion | | | |
| **Total Admitted Assets** | **$17 Billion** | | **Total Liabilities** | **$16 Billion** |
| | | | | |
| | **Surplus = $1 Billion** | | | |

67. If an insurance company's statutory surplus falls below a certain minimum dollar or RBC level, or to zero or even negative, then the company is in "hazardous financial condition," and state laws and regulations require disclosure by that company and immediate intervention by regulators to protect policyholders and annuity holders.

68.     If an insurance company's statutory surplus falls below minimum levels of capital and surplus and/or if it has an annual loss rather than a profit, the insurance company is not permitted to pay dividends.

69.     Accurate Annual Statement reporting is critically important, because the Annual Statement is made available to the public so that consumers, agents, and others can develop an assessment of the company's financial strength and ability to pay future claims as they come due.

70.     An insurance company's Annual Statement and statutory surplus is also the key variable in the financial strength rating assigned by rating agencies that assess the companies' financial strength, like A.M. Best, a rating agency that historically focuses on the insurance industry.  *See, e.g.*, A.M. Best Methodology, Criteria – Insurance, May 2, 2012, at page 1.

71.     As A.M. Best explains on its website, a financial strength rating is important because insurance agents and professionals depend on it "to assess the creditworthiness of an insurer's operations, to evaluate prospective reinsurance accounts, to compare company performance and financial condition," and a "rating can influence an agent's selection of plans to market."  Moreover, "[a] rating also is an important factor in the consumer's decision-making process to purchase insurance," and it "can provide consumers with the information necessary for an educated buying decision."[3]

D.     **Relevant Statutory Accounting Principles**

1.     **Fundamental Principles of Conservatism and Disclosure.**

72.     The NAIC AP&P Manual provides the Rules of Statutory Accounting for Insurance Companies.  All fifty states have adopted the AP&P Manual and the Annual Statement Instructions.

---

[3] http://www.ambest.com/ratings/guide.asp

73.     The NAIC prescribes the SAPs that govern the preparation of an insuring firm's financial statements.  The SAPs represent the top level of requirements in the statutory hierarchy of accounting requirements and are codified in the AP&P Manual.  With minor state-by-state variations, the SAPs form the basis for state regulation of insurance company solvency throughout the United States.

74.     The SAP Preamble:  Objectives of Statutory Financial Reporting, expressly sets forth statutory accounting's unique objective of protecting policyholders:  "The primary responsibility of each state insurance department is to regulate insurance companies in accordance with state laws with an emphasis *on solvency for the protection of the policyholders*. The ultimate objective of solvency regulation is to ensure that the policyholder, contract holder and other legal obligations are met when they come due and *that the companies maintain capital and surplus at all times and in such forms as required by statute to provide an adequate margin of safety.  The cornerstone of solvency is financial reporting*."  (Emphasis added.)

75.     To emphasize the point, the SAP Preamble: Conclusion states in pertinent part that "[a]pplication of SAP, either contained in the SSARs or defined as GAAP and adopted by NAIC, to unique circumstances or individual transactions should be consistent with the concepts of *conservatism, consistency, and recognition*."  (Emphasis added.)

### 2.     Annual and Quarterly Reporting Requirements.

76.     As of midnight on December 31 each year, management of every U.S.-based life insurer must swear, under penalty of perjury, to their true financial condition.  Assets must be valued truthfully and liabilities must be calculated in accordance with the law.  For a life insurer, liabilities are almost entirely made up of promises made to their annuitants and policyholders. These promises most often have very long-term commitments.  Because of the nature of the

insurance business, management must engage actuaries to calculate on a present value basis the total obligations associated with the annuities or life policies. Most of the life events or decisions that trigger claims have not yet happened. Therefore, to account for those future events that are bound under the annuities or policies, actuaries must calculate the present value of all of those future obligations.

77.     The insurance company reports this liability on the balance sheet. If the true value of the company's assets exceeds that liability, the company has surplus. If assets are insufficient to cover the liability, there is a deficit and the company must refrain from incurring additional obligations to policyholders, disclose its financial condition to its regulators and with the regulators must take action to protect the policyholders and annuitants.

**3.      Insurer Dealings with Affiliated Entities.**

78.     Historically, regulators had too often seen insurance policyholder and annuity holder funds siphoned off by for-profit holding companies for use by their non-insurer affiliates. So they developed and implemented rules relating to transactions among affiliated entities.

79.     SSAP No. 25 governs accounting for transactions with affiliates and other related parties. SSAP No. 25 in pertinent part provides:

> [1] Related party transactions are subject to abuse because reporting entities may be induced to enter transactions that may not reflect economic realities or may not be fair and reasonable to the reporting entity or its policyholders….
>
> ***
>
> [8] ***Loans or advances by a reporting entity to all other related parties shall be evaluated by management and nonadmitted if they do not constitute arm's – length transactions as defined in paragraph 11.*** Loans or advances made by a reporting entity to related parties (other than its parent or principal owner) that are economic transactions as defined in paragraph 11 shall be admitted.

- 19 -

***

[11] An arm's-length transaction is defined as a transaction in which willing parties, each being reasonably aware of all relevant facts and neither under compulsion to buy, sell, or loan, would be willing to participate***. *A transaction which results in the mere inflation of surplus without any other demonstrable and measurable betterment is not an economic transaction. The statutory accounting shall follow the substance, not the form of the transaction.*

***

[12] In determining whether there has been a transfer of the risks and rewards of ownership in the transfer of assets or liabilities between related parties, the following – and any other relevant facts and circumstances related to the transaction – shall be considered:

[a] Whether the seller has a continuing involvement in the transaction or in the financial interest transferred, such as through the exercise of managerial authority to a degree usually associated with ownership;

***

[14] A non-economic transaction is defined as any transaction that does not meet the criteria of an economic transaction. Similar to the situation described in paragraph 13, *transfers of assets from a parent reporting entity to a subsidiary, controlled or affiliated entity shall be treated as a non-economic transactions at the parent reporting level because the parent has continuing indirect involvement in the assets*.

***

[15][d] *Transactions which are designed to avoid statutory accounting practices shall be reported as if the reporting entity continued to own the assets or to be obligated for a liability directly instead of through a subsidiary*.

SAP 25 ¶¶ 1, 8, 11, 12, 14 & 15 (emphasis added).

80.     Efforts to detect and prevent affiliated transaction abuses have also led regulators

in all 50 states to adopt the NAIC Model Holding Company Act. The primary objective of the

- 20 -

NAIC Model Holding Company Act is to ensure that insurance companies' transactions with their affiliates, and otherwise, are "fair and reasonable" and done at "arms-length."

4.      **Reinsurance Transactions.**

81.     Insurance companies may, and often do, enter into legitimate reinsurance transactions.

82.     Traditionally, reinsurance was used by property and casualty insurers to spread their risk in the event of a catastrophic damage to many policy holders at once (*i.e.*, in the event of a storm).

83.     Life insurers, by contrast, commonly use reinsurance to keep financial ratios, particularly RBC, at desirable levels. Indeed, writing large amounts of business, particularly annuities, will cause assets and liabilities to increase very rapidly which, in turn, can strain surplus and negatively impact the insurer's financial ratios very quickly. Life insurers therefore use reinsurance primarily to keep financial ratios in line so they can use their distribution system to its full capacity and not limit the amount of new business they write.

a.      **The Way Reinsurance Is Supposed to Work.**

84.     When an insurer "cedes" risks of a block of life insurance policies or annuities through a *bona fide* reinsurance transaction, the assuming company is obliged by the governing reinsurance contract or "treaty" to set up reserve liabilities for that block. The ceding company can then drop those liabilities from its own financial statements because the assuming company is simultaneously responsible for and able to pay those liabilities.

85.     Assume, for example, that Company A originally sold 100 insurance policies to customers (policyholders), each with a death benefit of $100,000. Although extremely unlikely, the worst-case scenario for the insurer is that all 100 policyholders suddenly die the very next day. Doing the math, a $100,000 death benefit multiplied by 100 policies equals a $10 million

liability. However, the policyholders will not likely all die after one day, and for a given group actuaries can accurately predict the probability of when an insured of a given age within the group will die. Accordingly, immediately upon the sale of a $100,000 death benefit policy, the insurance company is not required to set up reserve liabilities for the entire $100,000; instead, between the date of issue and the ultimate date of death, the insurance company is expected to earn interest which will accumulate over time with the premiums to equal the final $100,000 benefit. So a very young, healthy, non-smoker will have a much lower initial reserve liability than an elderly smoker. This assessment, keyed to the present value of the obligations, is done through annual cash flow testing and reserve calculations.

86.    In insurance parlance, in this example the total needed to fulfill all contractual obligations (in this example $10 million) is referred to as the "Gross In-Force," the sum of all ultimate death benefit payments. But the insurance company only needs to have, today, the present-value of that $10 million Gross In-Force amount. For this example, assume that the actuarially required immediate reserve liability is $1 million for the entire block.

87.    When Company A cedes this block of policies to Company B in a reinsurance transaction, Company A *drops* the present value amount of $1 million from its liabilities and Company B *sets up* the $1 million liability on its books. Company B is now basically standing in the shoes of Company A, and must pay to Company A $100,000 for each death claim as it is made. The terminology used to describe Company A's reduction of the $1 million liability is a "reserve credit." In this way, Company A reduces its liabilities by $1 million and Company B adds $1 million to its liabilities.

88.    Company A's contractual obligation to pay the policyholder does not change, however, regardless of whether Company B is able to pay claims as they come due. In other

words, even though Company B must pay the claims to Company A as they come in, and even though Company A is allowed to take a reserve credit (reduction) of $1 million, Company A is still obligated to pay the claim if Company B is unable to meet its reinsurance obligations.

89.     This is why if the assuming company lacks sufficient demonstrable financial strength to honor the liabilities assumed from Company A (in the words of SAP No. 25, "independent payment ability"), statutory insurance accounting does not permit the $1 million reserve credit to Company A, because there is considerable concern that Company B will not be able to independently make good on its obligations to Company A.  In such a case, Company A may not reduce its liabilities for the cession to Company B.  Reversing the transaction restores a $1 million increase in Company A's liabilities, in turn causing a reduction of $1 million to Company A's otherwise falsely inflated surplus.

90.     Historically, insurance companies have chosen to reinsure their risks with highly capitalized and independent ("non-affiliated") companies.  Legitimate reinsurers may be chosen not only for their strong financial support, but also for their significant expertise and advice.  A knowledgeable, well-capitalized and honest reinsurer can be a tremendous aid in helping a company spread its risks (helping minimize the "too many eggs in one basket" exposure) and share knowledge of good underwriting practices and economic expectations.  The independent reinsurer has its own set of experienced executives, actuaries and other experts who can help the ceding company achieve their shared goals.  With well-capitalized and independent reinsurers, the valid purpose for reinsuring risks is achieved.

### b.     The Way Reinsurance Can Be Abused.

91.     In recent years, "for-profit" insurance companies have dramatically increased their reliance on reinsurer companies who are not only insufficiently capitalized but also the opposite of independent:  they have ceded risks ***to their own affiliates***.

92.     Often there is no real difference in the two companies:  they are sister companies that may likewise sell life and/or annuity policies, or may be mere shells with no independent operations whatsoever.  A reinsurance transaction in this context does nothing to alter the ceding company's true financial condition.

93.     There can be meaningful purposes for *some* affiliated reinsurance, such as moving certain lines of business to an affiliate that specializes in that line.  But to cede substantial blocks of life or annuity business from one life insurer to another affiliated life insurer accomplishes nothing of economic substance, and evidences an improper motive.

94.     Likewise, to cede a block of insurance to a reinsurer who is insufficiently capitalized to handle the risk, accomplishes nothing; the ceding insurer will still be obligated to pay, and shunting its obligations to a shell affiliate does not eliminate or reduce its liabilities.

95.     In cases where the reinsurer is a captive domiciled in Vermont, Iowa or the Cayman Islands – jurisdictions that permit captive reinsurance transactions – the opportunity for impropriety is even greater, in that the captive's finances cannot be examined by the public or even regulators from other states; the captives are not required to file any public financial statements, and regulators from other states may not review their finances.  In short, the captive can be used as a "black box" into which insurance companies dump liabilities undetected.

96.     One illicit motive of such an illusory reinsurance transaction with an affiliate or an undercapitalized non-affiliate is to enable the insurer to report (falsely) that the transaction "frees up" surplus for the ceding company, allowing that sham surplus to support selling even more life and annuity policies to raise more premium dollars and enable a for-profit holding company to siphon off the ceding insurer's revenues (through dividends or other payments to non-insurance affiliates) with the false appearance of propriety.

- 24 -

97.     Such a "reserve discounting" scheme is expressly forbidden by the NAIC's Model Holding Company Act adopted by all 50 states.  It is referred to in the insurance industry as "window dressing."  When the ceding company transacts with an affiliated or an unaffiliated reinsurer, the terms must be fair and reasonable; one party can't benefit to the other party's detriment.

98.     Such "window dressing" or reserve discounting schemes are explicitly prohibited under the Model Holding Company Act and in the states adopting it.  For example, in Iowa, one of the states adopting the Model Holding Company Act, disclosure of "affiliated transactions" is required:

> 1.      *Transactions within a holding company system affecting domestic insurers.*
>
>         a.      Material transactions by registered insurers with their affiliates are subject to the following standards:
>
>                 (1)    The terms shall be fair and reasonable.
>
>                 (2)    Charges or fees for services performed shall be reasonable.
>
>                 (3)    Expenses incurred and payment received shall be allocated to the insurer in conformity with customary and consistently applied insurance accounting practices.
>
>                 (4)    The books, accounts, and records of each party shall be so maintained as to clearly and accurately disclose the precise nature and details of the transactions.
>
>                 (5)    After any material transaction with an affiliate and after any dividends or distributions to shareholder affiliates, the insurer's surplus as regards policyholders shall be reasonable in relation to the insurer's outstanding liabilities and adequate to its financial needs.

Iowa Code 521A.4.

99.     In short, the "precise nature and details" must be "clearly and accurately" disclosed on the books of each company or the transaction is not permitted. That language is necessary because without the precise nature and details of a transaction, it is impossible to detect "window dressing" or obfuscation of a company's true finances.

### 5.     The Fraudulent Use of Captives in Reserve Discounting.

100.     A true captive insurance company is a special kind of risk financing wherein a **non-insurance** company creates an insurance subsidiary with the non-insurance company as the sole policyholder. The traditional captive insurer is a regulated entity designed to provide a form of self-insurance. In addition to establishing a self-insurance vehicle, the company is able to write off the premiums to the captive as deductible expenses, which helps the company's overall tax profile. Companies typically form captives when they are either so large that they have more resources than the insurers who would be covering their risk, or when it is simply less expensive to start and run one's own insurance company than it is to pay the market value for certain kinds of insurance.

101.     The International Association of Insurance Supervisors (IAIS) has defined a captive insurer as "an insurance or reinsurance entity created and owned, directly or indirectly, by one or more industrial, commercial or financial entities, **other than an insurance or reinsurance group entity**, the purpose of which is to provide insurance or reinsurance cover for risks of the entity or entities to which it belongs, or for entities connected to those entities and only a small part if any of its risk exposure is related to providing insurance or reinsurance to other parties" (emphasis added).

102.     However, insurance companies themselves have nevertheless begun to create subsidiaries they call "captives," primarily to purportedly transfer insurance risks (as the "ceding company") that they have assumed through the sale of their insurance policies and annuities.

103.    Insurance companies first began using off shore captive affiliates in places like Bermuda, the Cayman Islands and various Caribbean countries to transfer liabilities, as the finances of these offshore captive reinsurers largely remain secret.

104.    Recently, however, insurers have imported this practice to the United States. Several states, including Vermont, passed laws designed to allow insurance companies to create and utilize the so-called "captives" or "special purpose financial captives (SPFCs)" in their states in the way insurers had been doing with off-shore captives, in the hopes of spurring a cottage industry that purportedly generates fee revenues and creates jobs.

105.    These states allow insurance companies to shield the finances of the captive entities (which do not file public financial statements), creating a black box into which liabilities can be transferred without detection from the public, the rating agencies and even regulators in other states who do not promise to keep the captives' finances confidential.  Such state laws feature confidentiality protections that allow insurance companies to disregard the requirements of transparency and disclosure regarding transactions with affiliated entities.

106.    Vermont, for example, enshrouds the financial condition of its SPFCs with a cloak of confidentiality, providing that "[i]nformation submitted pursuant to this subsection shall be and remain confidential, and may not be made public by the Commissioner or an employee or agent of the Commissioner without the written consent of the company."  Vt. Stat. Ann. tit. 8, § 6002(c)(3).  That statute allows Vermont's Commissioner of the Department of Financial Regulation to make disclosure only (a) in response to a subpoena in a civil action or contested case to which the captive insurance company that submitted such information is a party, or (b) in its discretion to a public officer having jurisdiction over the regulation in another state, provided that:

(i)    such public official shall agree in writing to maintain the confidentiality of such information; and

(ii)   the laws of the state in which such public official serves require such information to be and to remain confidential.

Vt. Stat. Ann. tit. 8, § 6002(c)(3).  The same strict confidentiality restrictions apply to examinations and investigations by the commissioner into a captive insurance company's financial condition:

> ***All examination reports, preliminary examination reports or results, working papers, recorded information, documents and copies thereof produced by, obtained by or disclosed to the commissioner or any other person in the course of an examination made under this section are confidential and are not subject to subpoena and may not be made public by the commissioner or an employee or agent of the commissioner without the written consent of the company,*** except to the extent provided in this subsection.  Nothing in this subsection shall prevent the commissioner from using such information in furtherance of the commissioner's regulatory authority under this title.  The commissioner may, in the commissioner's discretion, grant access to such information to public officers having jurisdiction over the regulation of insurance in any other state or country, or to law enforcement officers of this state or any other state or agency of the federal government at any time, so long as such officers receiving the information agree in writing to hold it in a manner consistent with this section.

Vt. Stat. Ann. tit. 8, § 6008(c) (emphasis added).  These confidentiality restrictions are expressly made applicable to Vermont SPFCs in Vt. Stat. Ann. tit. 8, § 6048(a).

107.    The confidentiality protections available in Bermuda and the Cayman Islands are equally secretive, in that the captive companies file no public financial statements or other financial information.

108.    Although the legitimacy of insurance companies' creating captives to transfer liabilities is dubious at best, the use of such captives or special purpose vehicles ("SPVs") as a means to avoid statutory accounting requirements is universally recognized as prohibited under

SAP.  As one example, AIG in 1987 off-loaded some $1 billion in losses to its captive Coral Re, and then moved those liabilities to another captive, Richmond Re (state regulators ultimately objected).  The losses returned to AIG's main balance sheet after regulators deemed that the captive transaction was little more than an effort to purge liabilities from AIG's books by making them appear to be third-party reinsurance recoverables.

109.    Industry commentators have likewise recognized the potential for misconduct in allowing commercial insurance companies to form their own captive insurance companies. W.O. Myrick, a retired state insurance examiner, has been quoted as saying that insurance captives have no business assuming policy liability risks, which should remain with the company that had underwritten the policies:  "In my experience, where there is an opportunity to throw liabilities into a vehicle that is shielded [from the public], then there is a very high likelihood that the insurer chose to do this so as to falsify reserves."  "What I fear is that the captives are being used to hide more and more risk.  And when risk bounces from one entity to another, it often vanishes."

110.    Douglas Murray, an analyst and group managing director at Fitch Ratings of Chicago, has noted that some people refer to these purported captives as the "black hole" of insurance company financial analysis.

111.    In July 2013, the NAIC formally adopted a white paper prepared by its Subgroup entitled *The Captive and Special Purpose Vehicles: An NAIC White Paper* ("NAIC White Paper").[4]  In it, the NAIC bluntly states:  "Commercial insurer-owned captives and SPVs should not be used to avoid statutory accounting."  *Id*. at 3; *id*. at 20 ("the general opinion of the Subgroup was that it is inappropriate for captives and SPVs to be used as a means to avoid

---

[44] http://www.naic.org/store/free/SPV-OP-13-ELS.pdf

statutory accounting"); *id.* at 23 (recognizing "a consensus view that captives and special

purpose vehicles should not be used by commercial insurers to avoid statutory accounting

prescribed by states."); *id.* at 30 ("The practice of using a different entity or different structure

outside of the commercial insurer to engage in a particular activity because of a perception that

the regulatory framework does not accurately account for such activity should be discouraged.

The Subgroup held a consensus view that captives and SPVs should not be used by commercial

insurers to avoid statutory accounting prescribed by the states.").

112.    The NAIC White Paper also specifically addressed the impropriety of capitalizing

the SPV with letters of credit ("LOCs") not permitted as admitted assets for the ceding insurance

company claiming a reinsurance credit.  In this regard, the NAIC Subgroup in particular stated:

> The transactions involving conditional LOCs or parental
> guarantees effectively permit assets to support reinsurance
> recoverables, either as collateral or as capital, in forms that are
> otherwise inconsistent with requirements under Model #785 and
> Model #786 or other financial solvency requirements applicable to
> U.S.-domiciled commercial assuming insurers.  The Subgroup held
> a consensus view that these types of transactions may not be
> consistent with the NAIC credit for reinsurance requirements.

*Id.* at 23; *see also id.*, at 31.

113.    The unsanitized discussion draft of the White Paper was more blunt:

> The transactions involving conditional LOCs or parental
> guarantees effectively permit assets to support reinsurance
> recoverables, either as collateral or as capital, in forms that are
> otherwise inconsistent with requirements under the credit for
> reinsurance models or other financial solvency requirements
> applicable to U.S.-domiciled commercial assuming insurers.  The
> subgroup held a consensus view that these types of transactions
> were not consistent with the NAIC credit for reinsurance
> requirements.  ***It is not financially sound to provide credit for
> reinsurance when the assuming insurer's solvency depends on a
> parental guaranty, while the parent's surplus that supports that
> guaranty includes credit for the very reinsurance whose
> performance depends on the guaranty.  Similar bootstrapping
> problems arise if reinsurance is directly secured by an LOC, or is***

> *indirectly secured when an LOC is used to capitalize the
> assuming insurer, and the ceding insurer itself, or one of its
> affiliates, is the LOC applicant, which becomes liable to
> reimburse the bank if the LOC is drawn.*

November 29, 2012, Draft White Paper, Attachment One-B, at 18 (emphasis added).

114.    In June 2013, the New York State Department of Financial Services issued a report entitled "*Shining a Light on Shadow Insurance: A Little-known Loophole that Puts Insurance Policyholders and Taxpayers at Great Risk*" ("the Lawsky Report"), a true and accurate copy of which is attached as Exhibit C, in which the Department criticized the use of reinsurance transactions with captives as a means "to divert reserves for other purposes besides paying policyholder claims" and "to artificially boost" RBC.  The Lawsky Report called for an "immediate national moratorium" on approving reinsurance transactions between insurers and their captives until investigations are conducted by the NAIC, the Federal Insurance Office and the Office of Finance Research.

115.    In short, an otherwise regulated commercial insurer like F&G Insurance is not permitted to do in its SPV what it cannot do itself.  Liabilities originating with (and retained by) the ceding insurer do not disappear by moving those liabilities onto the books of an affiliated captive or an undercapitalized non-affiliate.

116.    Here, precisely as feared by the NAIC and the Lawsky Report, Defendants have entered into reinsurance transactions and created SPVs designed to avoid statutory accounting rules and principles so as to give F&G Insurance's financial statements the false aura of financial stability and statutory surplus and – á la Enron – misstate the true surplus and financial condition of F&G Insurance.

- 31 -

## V. DEFENDANTS' FRAUDULENT SCHEME

117. To give F&G Insurance the appearance of having substantial positive surplus and financial strength after its acquisition in April 2011, Defendants engaged in a series of fraudulent accounting maneuvers in violation of the foregoing SAP principles that in combination effectively misrepresent F&G Insurance's surplus and financial strength by:

(a) repeatedly transferring liabilities off its balance sheets through fraudulent non-economic non-arms' length "reinsurance" transactions,

(b) mischaracterizing certain liabilities as "admitted assets," and

(c) misrepresenting the value of the billions of dollars of MBS and other "toxic" assets held by F&G Insurance.

118. Defendants engaged in a fraudulent accounting scheme by which liabilities and assets were shifted so many times both within the holding company system and outside of that system so as to confuse and obfuscate F&G Insurance's true financial condition. All the while, Defendants used captive entities and the secrecy surrounding these entities to cover their trail.

119. Each of these misdeeds violates the well-established accounting rules described above and has contributed to the false portrayal of the F&G Insurance's financial condition and stability. As a result, annuity holders, like Plaintiff Ludwick, paid for products that were far less valuable than represented and hold far riskier products than they believed they were purchasing.

### A. Harbinger's Acquisition of F&G Insurance

120. F&G Insurance was formerly named OM Financial Life Insurance Group. ("OMFLIC") and was owned by OM Group (UK) Limited ("OM Group").

121. As F&G Insurance's prior CEO Lee Launer described it, OMFLIC was at the end of 2010, "a company that had some difficulties….like everybody did in '07, '08, '09…and it was

a company searching for an owner…for that owner that could support it and build it, and take it, take it forth…."[5]

122.     Despite these "difficulties," F&G Insurance's Annual Statement for 2010 reported a positive surplus of $899 million.  That positive surplus was, however, based in large part on (1) $1.43 billion of reserve credits claimed for liabilities ceded to OM Group's Irish captive reinsurer, Old Mutual Reassurance (Ireland) Ltd. ("OM Re"), and (2) toxic mortgage-backed securities whose book value of over $961 million F&G Insurance used as an admitted asset to apply dollar-for-dollar against liabilities even though it knew the market value of these mortgage-backed securities was only a fraction of that amount.

123.     This purported positive surplus made F&G Insurance an attractive target for venture capitalists like Falcone and Harbinger.  Indeed, because of OMFLIC's reported surplus, it had instant capital that a private equity firm like Harbinger could employ in its investment strategies.

124.     On April 6, 2011, Harbinger purchased OMFLIC.

125.     Effective April 11, 2011, OMFLIC changed its name to "Fidelity & Guarantee Life Insurance Company."

126.     Unlike other recent private equity purchases of annuity companies that have at least infused some initial capital into the newly acquired insurance company, Harbinger did not infuse *any* capital into F&G Insurance upon its acquisition.  Nor did F&G Insurance receive any capital contributions from its parent in 2012 or 2013.

---

[5] Video Clip of CEO Lee Launer entitled "Lee Launer on Harbinger Capital," www.youtube.com/watch?v=sKVm93QpOTw.

127. Instead, as reflected in F&G Insurance's Annual Statements, Harbinger immediately began *extracting* hefty cash dividends of $40 million in 2011, $40 million in 2012, and $40 million in 2013.

128. As explained above, F&G Insurance is only permitted to pay such dividends from its surplus. However, upon its acquisition by Harbinger, F&G Insurance had no such surplus, and its finances were severely strained.

129. Rather than report its true financial condition, which would have cut F&G Insurance's reported surplus by more than half, Defendants hid it through a series of sham reinsurance transactions with its wholly owned captive insurance companies and certain accommodating unaffiliated reinsurance companies. As shown below, these non-arms' length transactions involved significant and improper reserve discounting to falsely enhance F&G Insurance's reported statutory surplus and its reported RBC.

## B. F&G Insurance Has To Reclaim Ceded Liabilities from OM Re

130. Pursuant to the Stock Purchase Agreement, Defendants were required to unwind the reinsurance transaction OMFLIC had entered into with its captive affiliate OM Re. As a result of Harbinger's purchase of OMFLIC and formation of F&G Insurance, OM Re was no longer a wholly owned captive of what was now F&G Insurance and had no incentive to maintain F&G Insurance's liabilities without commensurate assets to cover those liabilities.

131. Thus on April 7, 2011, the day after its acquisition by Harbinger, F&G Insurance was required to recapture all the life insurance business it had ceded to OM Re, comprised of $1.148 billion of net statutory reserves and the reestablishment of the related interest reserve of $4 million.

132. Based on Harbinger's filings with the Securities and Exchange Commission ("SEC"), at least a majority of this $1.148 billion in net statutory reserves that F&G Insurance

recaptured from OM Re represented the lifetime guarantee on a large portion of universal life business sold prior to the acquisition. These lifetime guarantees for universal life policies were aggressively marketed and underfunded and strained the finances of life insurance companies such as F&G Insurance.

133.    Along with those liabilities, however, OM Re transferred only $654 million in assets.

134.    F&G Insurance instantly recognized a $488 million increase in reserve liabilities associated with the recapture of this business.

**C.    F&G Insurance's 2011 Captive Reinsurance Transaction with Raven Re**

135.    Lacking assets to offset this $488 million liability, and eager to execute its strategy to expand F&G Insurance's annuity business – an expansion that would quickly strain surplus and negatively impact current RBC ratios – Defendants then began to implement their own scheme to hide these massive liabilities and inflate F&G Insurance's reported surplus.

136.    Defendants first created Raven Re in early 2011, a wholly owned Vermont special purpose captive reinsurance company. F&G Insurance capitalized Raven Re with only a $295 million line of credit facility provided by Nomura Bank International plc ("Nomura LOC") and guaranteed by OMGUK (an affiliate of OM Re) and by a Harbinger company.[6]

137.    Contemporaneous with the return of the first batch of liabilities from OM Re, F&G Insurance ceded $909 million in reserve liabilities to Raven Re effective April 11, 2011. F&G Insurance at the time ceded **no assets** at all to Raven Re. Instead, F&G Insurance designated $473 million of the $909 million liability as so-called "non-economic reserves" – a term that does not exist in statutory accounting – and this $473 million liability was unfunded by

---

    [6] The F&G Stock Purchase Agreement, however, required Harbinger to replace this letter of credit facility by December, 2012. F&G 2011 Annual Statement at 19.15.

Raven Re and backed only by the Nomura LOC. The remaining $436 million liability, designated as "economic reserves" – a term that also does not exist in statutory accounting – was assumed by Raven Re on a "funds withheld" basis.

138. A "funds withheld" reinsurance transaction is less common type of reinsurance transaction as the ceding company (here, F&G Insurance) pays no ceding premium and transfers no assets to the reinsuring company (here, Raven Re). Instead, the ceding company retains the assets and simply pays the net difference between the otherwise payable premium and the reserve credit taken by the ceding company. While the ceding company is generally not allowed to take a reserve credit for a funds withheld reinsurance transaction, such transactions do favorably impact the ceding company's RBC ratios and can be readily abused by a ceding company to move troubled assets off of its books.

139. Through this transaction, F&G Insurance purportedly transferred the risk for the entire $909 million in reserve liabilities to Raven Re even though it only transferred $436 million in assets (albeit on a "funds withheld" basis). Indeed, F&G Insurance characterized the $473 million it intended to take in reserve credits as a "gain" that offset the $488 million in liabilities, which it characterized as a "loss," from the recapture of the business from OM Re.

140. F&G Insurance's ceding to Raven Re of the liabilities recaptured from OM Re was not a *bona fide* reinsurance transaction because there was no meaningful risk transfer to Raven Re. Indeed, not only were $473 million in liabilities unfunded and secured only with a $295 million LOC facility, that LOC would remain in place only until the end of 2012 while the liabilities extended years beyond that date.

141. Defendants then compounded the deception by claiming a benefit from the common stock "appreciation" Raven Re enjoyed by booking the Nomura LOC as an asset.

Specifically, as the 100% holder of Raven Re's stock, F&G Insurance should have valued that stock at $473 million below zero, because F&G Insurance sent $909 million of real liabilities to Raven Re **with no assets** and only withheld funds to cover $436 Million of those liabilities.

142.    In lieu of sending **real** assets to Raven Re, F&G Insurance simply paid a LOC facility "structuring fee" to Nomura Bank for the Nomura LOC facility placed with Raven Re as the "asset" to offset Raven Re's new liabilities.  However, for the purpose of valuing the Raven Re common stock, F&G Insurance reported that by virtue of Raven Re's being "permitted" to carry the Nomura LOC facility as an admitted asset of its Vermont captive, F&G Insurance increased its carrying value of its Raven Re stock on its own balance sheet in Iowa.

143.    Although as a non-Vermont non-captive, F&G Insurance would never be permitted to carry an LOC facility as an admitted asset, F&G Insurance effectively did just that by slipping it in the back door via its reported value of the Raven Re common stock.

144.    In fact, for reasons it has yet to disclose, F&G Insurance unwound the sham reinsurance transaction with Raven Re before the end of 2011, and then purported to reinsure these liabilities in a reinsurance transaction with Wilton Re.

**D.    F&G Insurance's 2011 Reinsurance Transactions with Wilton Re**

145.    F&G Insurance's 2011 Annual Statement references "existing coinsurance arrangements" Wilton Reassurance Company (Wilton Re), a wholly owned subsidiary of Wilton.

146.    Prior to the purchase of F&G Insurance, on January 26, 2011, Harbinger and Wilton entered into a Commitment Agreement to make two amendments to the existing coinsurance arrangements with Wilton Re that provided for ceding much of F&G Insurance's insurance business to Wilton Re at some point after the purchase of F&G Insurance.

147.    On April 8, 2011, two days after Harbinger's purchase of F&G Insurance, under the first of these amendments, Defendants began ceding the remainder of the life insurance

- 37 -

business F&G Insurance had retained after ceding $909 million to Raven Re. On that date, Defendants ceded $651 million of reserve liabilities to Wilton Re. Along with it, F&G Insurance sent only $543 million in assets. Through this transaction, F&G Insurance reported a net gain of $114 million.

148.    The second of the amendments to the coinsurance arrangements with Wilton Re, was entered into on April 26, 2011. This amendment, titled the "Raven Re Springing Amendment," committed F&G Insurance to cede to Wilton Re all of the business reinsured with Raven Re on or before December 31, 2012. This transaction was necessary because Defendants only had until December 31, 2012, to replace the LOC facility that was supposedly "capitalizing" Raven Re.

149.    On October 17, 2011, Defendants contemporaneously recaptured the liabilities ceded to Raven Re and ceded them to Wilton Re.

150.    The original sham reinsurance transaction with Raven Re was reflected in the recapture transaction. Indeed, instead of the $473 million gain F&G Insurance claimed to have recognized by removing $909 million in reserve liabilities from its books and ceding them to its wholly owned captive, Raven Re, F&G Insurance actually recognized a ***$525 million loss*** when those reserve liabilities (which had never been collateralized with corresponding assets) were returned from Raven Re. Indeed, the "assets" that had been "transferred" with the liabilities to Raven Re were nothing more than a LOC facility, the liabilities never left the holding company structure, and F&G Insurance was required to now take a loss for reserve liabilities it should have accounted for in the first place. Of course, F&G Insurance had already used the alleged "gain" from the Raven Re transaction to offset its losses from having to unwind the OM Re reinsurance transaction at acquisition.

151.     Now that F&G Insurance had to recognize a huge loss from its sham reinsurance transactions, Defendants again needed to hide that loss.  This time they used Wilton Re.

152.     On October 11, 2011, F&G Insurance sent $927 million in reserve liabilities to Wilton Re and took a corresponding reduction in its reserve liabilities.  Based on Harbinger's SEC filings, it appears that a significant portion of this $927 million in liabilities included the risk of lifetime guarantees on a large portion of the universal life line of business.

153.     At the same time, however, F&G Insurance did not send assets commensurate to the liability and only ceded premium purportedly equal to $427 million, plus an unusual "negative ceding commission" of $135 million, to Wilton Re.  F&G Insurance even reported a $365 million "gain" in surplus.

154.     The reinsurance transaction with Wilton Re is a sham that takes advantage of the fact that regulators typically never question reinsurance transactions with authorized and unaffiliated entities.  No reinsurer entering into a legitimate, arms-length transaction would accept terms that purport to give the ceding company an immediate "gain" of $365 million, particularly if the liability being assumed purportedly included the risk of lifetime guarantees on universal life products.

155.     Indeed, the apparent goal of this sham reinsurance transaction was for F&G Insurance to manufacture a "gain" of $365 million to offset the liabilities it recaptured after unwinding the sham Raven Re transaction.

156.     By the end of 2011, Defendants had ceded $1.72 billion of F&G Insurance's insurance business to Wilton Re, for which F&G Insurance took a $1.72 billion reserve credit,

but had transferred only approximately $1.15 billion in assets. This not only shows the sham nature of the transactions, but puts the annuity holders at grave risk of default.[7]

157.    Not only did this transaction lack mirroring, it should not have been used to move liabilities off F&G Insurance's books as Wilton Re was not adequately capitalized to assume the massive liabilities F&G Insurance was sending.

158.    Even Wilton Re's *reported* surplus of $326,363,178 in 2011 did not make up for the $570 million deficit in assets sent to Wilton Re.  In reality, Wilton Re itself only reported a surplus because it purportedly sent $1.4 billion of its liabilities to its own Bermuda based affiliated captive.

159.    Based on the terms of the transaction, and upon information and belief, Wilton Re engaged in a fraudulent scheme to help Defendants hide F&G Insurance's liabilities and true financial condition by assuming vastly more liabilities than assets in a reinsurance transaction with F&G Insurance.

**E.    Defendants' Scheme Continued in 2012**

**1.    F&G Insurance's 2012 Captive Reinsurance Transactions with Raven Re.**

160.    Effective October 1, 2012, F&G Insurance recaptured the remaining balance of liabilities held by OM Re (described as "Waiver of Surrender Charge" features on deferred annuities) of approximately $281 million.

161.    F&G Insurance simultaneously transferred the recaptured liabilities to Raven Re. Because the transaction was done on a so-called "funds withheld" basis, F&G Insurance transferred no assets or premiums to Raven Re as a statutory reserve for the ceded liabilities.

---

[7] In its 2012 Annual Statement, F&G Insurance claimed a reserve credit from Wilton Re of $1.761 billion and in its 2013 Annual Statement a reserve credit from Wilton Re of $1.776 billion.

162. F&G Insurance would have realized a loss on the recapture of this business from OM Re equal to the statutory reserves re-established upon recapture of $281 million. However, F&G Insurance contemporaneously realized a gain equal to the reserve credit of $281 million established upon the re-cession of this business to Raven Re. This purported gain offset against the loss recognized on the recapture of the business from OM Re since the re-cession of the business to Raven Re occurred with the recapture of the business from OM Re.

163. F&G Insurance simultaneously erased that substantial loss by merely continuing the sham in its cession to Raven Re by sending no assets with the ceded liabilities.

164. At the time, Raven Re remained capitalized with nothing more than the $295 Million Nomura letter of credit facility that reduces in amount each quarter. A letter of credit facility is not an admitted asset under statutory accounting; at best, it might be referred to as a contingent asset.

165. The 2012 Raven Re reinsurance transaction lacked consideration, was non-economic in nature, and was executed solely to falsely enhance the appearance of F&G Insurance's financial condition through false enhancement of surplus, asset values, and RBC.

166. Even though F&G Insurance did nothing to rid itself of the liability by ceding insurance liabilities to its wholly owned captive, F&G Insurance claimed a reserve credit from Raven Re of $257,800,455 on its 2012 Annual Statement, effective October 1, 2012:

| General Account - Unauthorized - Affiliates - U.S. Affiliates | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 14069... | 27-3993835... | 10/01/2012 | RAVEN REINSURANCE COMPANY | | VT | YRT/A... | | 257,800,485 |
| 14069... | 27-3993835... | 12/31/2011 | RAVEN REINSURANCE COMPANY | | VT | COFW/A... | | |
| 0899999 | Total - General Account - Unauthorized - Affiliates - U.S. Affiliates | | | | | | 0 | 257,800,485 |

167. Furthermore, F&G Insurance at year-end 2012 again increased the value of its common stock in Raven Re to $153 million, once again improperly treating the Nomura LOC as an admitted asset.

- 41 -

010342-13 741518 X1    Case 4:15-cv-00011-DGK    Document 1    Filed 01/07/15    Page 44 of 76

2.  **F&G Insurance's 2012 Captive Reinsurance Transactions with Front Street Cayman.**

168.    In 2012, Defendants also formed Front Street Cayman, a wholly owned subsidiary of Harbinger's wholly owned subsidiary Front Street Re.  According to Harbinger, Front Street Cayman provides "reinsurance solutions that improve clients' leverage ratios and capital positions through the assumption of life and fixed annuity liabilities."[8]

169.    Defendants then had F&G Insurance on December 31, 2012 cede approximately $1.3 billion in liabilities to Front Street Cayman.  Falcone personally lauded the transaction in a Harbinger press release issued in mid-December 2012:  "This transaction marks a significant milestone for establishing our reinsurance platform, while also supporting continued growth of Fidelity and Guaranty Life.  With Front Street Re's experienced management team, we see an opportunity to grow our reinsurance franchise by providing customized reinsurance solutions to life insurance and fixed annuity companies."[9]

| 00000. | AA-3770397 | 12/31/2012 | FRONT STREET RE (CAYMAN) LTD | | CYM. | ACOFWil | | | 1,332,245,828 |
| 0999999. | Total - General Account - Unauthorized - Affiliates - Non-U.S. Affiliates. | | | | | | | 0 | 1,332,245,828 |
| 1099999. | Total - General Account - Unauthorized - Affiliates. | | | | | | | 0 | 1,590,048,313 |

170.    F&G Insurance in its 2012 Annual Statement claimed a reserve credit of over $1.3 billion for liabilities transferred to Front Street Cayman:

171.    Once again, no assets were actually transferred to Front Street Cayman, as the reinsurance transaction was again implemented on a "funds withheld" basis.  The withheld funds

---

[8] http://www.4-traders.com/HARBINGER-GROUP-INC-5839604/news/Harbinger-Group-Inc--Harbinger-Group-Inc-Receives-Approval-For-Inaugural-Reinsurance-Treaty-Betwee-15654192/

[9] http://www.4-traders.com/HARBINGER-GROUP-INC-5839604/news/Harbinger-Group-Inc--Harbinger-Group-Inc-Receives-Approval-For-Inaugural-Reinsurance-Treaty-Betwee-15654192/

are managed by Harbinger affiliate Harbinger Asset Management, LLC. 2012 Annual Statement at 19.22.

172.    By claiming the reserve credit of $1.3 billion, and doing so on a funds withheld basis, F&G Insurance enhanced its reported surplus and RBC without transferring to Front Street Cayman actual and valuable assets commensurate with the transfer of its liabilities off the books of F&G Insurance.

173.    In its 2013 Annual Statement, F&G Insurance again claimed a reserve credit as of December 31, 2013, of over $1.2 billion for liabilities ceded to Front Street Cayman on a "funds withheld" basis.

**F.    Summary of Sham Reinsurance Transactions**

174.    By year-end 2011, Defendants had moved over $1.728 billion in F&G Insurance liabilities to Raven Re ($28 million) and to Wilton Re ($1.7 billion) and transferred nowhere near this amount of assets to cover those liabilities. All this was done at a time when F&G Insurance misleadingly claimed a surplus of $843 million.

175.    By year-end 2012, Defendants had moved over $3.3 billion in F&G Insurance liabilities to Raven Re ($257 million), to Front Street Cayman ($1.33 billion), and to Wilton Re ($1.761 billion), again with nowhere near the assets to cover those liabilities, at a time when it misleadingly claimed a surplus of $897 million.

176.    By year-end 2013, Defendants had had moved over $3.2 billion in F&G Insurance liabilities to Raven Re ($184 million), to Front Street Cayman ($1.24 billion), and to Wilton Re ($1.776 billion), with insufficient corresponding assets, at a time when it misleadingly claimed a surplus of $1.1 billion.

177.    As a result of Defendants' scheme, annuity holders like Plaintiff Ludwick paid for products that were not as represented, hold products far riskier than they believed they were

purchasing, and have been credited interest or index returns lower than those that are commensurate with the undisclosed risks assumed by the purchasers.

**G.     F&G Insurance's Misstated Asset Values**

178.    Through and in addition to Defendants' fraudulent accounting practices designed to hide F&G Insurance's spiraling liabilities, Defendants also misrepresented F&G Insurance's financial condition by misstating asset values.

179.    All insurers are required to identify the extent of their Mortgage Backed Securities ("MBS") holdings in their Annual Statement.  In addition, insurers are required to distinguish between (1) pass-through MBS issued or guaranteed by government agencies (such as GNMA, FNMA and FHLMC), and (2) other CMOs and REMICs.  For items in the second category, insurers are required to state the amount of its holdings which is neither (1) issued or guaranteed by specified government agencies (GNMA, FNMA, FHLMC or VA) nor (2) issued by non-US government agencies but collateralized by MBS issued or guaranteed by those agencies.  These derivative products, which are the most risky form of MBS, are classified as a "Line 1.523 All other" figure.

180.    F&G Insurance reported in its 2011 Annual Statement over $672.6 million in "Line 1.523 All Other" MBS – an amount that *alone* exceeds three-fourths of its $843 million reported surplus for 2011.

181.    F&G Insurance reported in its 2012 Annual Statement over $900.3 million in "Line 1.523 All Other" MBS – an amount that *alone* exceeds its $897 million reported surplus for 2012.

182.    By year-end 2013, F&G Insurance included as admitted assets over $1.3 billion of "Line 1.523 All other" MBS – an amount that *alone* again exceeds its $1.1 billion reported surplus for 2013.

183.     In its Annual Statements, F&G Insurance reports its "Line 1.523 All other" MBS not at its true current value, but at its original cost.  This is not permitted under SAP; such assets may be carried at cost only if there is no doubt as to the MBS issuer being viable throughout the debt instrument's life to maturity.

184.     Given F&G Insurance's falsely inflated positive surplus, even if the MBS issuer could pay to maturity, F&G Insurance, itself, is at risk of not being viable until maturity.

185.     The value of the "Line 1.523 All other" securities must be marked **to *realizable value***.

186.     Because these assets are valued at cost and not marked to realizable value, they are substantially overvalued.

187.     This overvaluing of assets is yet another example of Defendants' misstatement of F&G Insurance's financial picture and the stability of its ability to meet annuity and policy holder needs.

188.     As a result of Defendants' fraudulent scheme, annuity holders like Plaintiff Ludwick paid for products that were not as represented, hold products far riskier than they believed they were purchasing, and have been credited interest or index returns lower than those that are commensurate with the undisclosed risks assumed by the purchasers.

**H.     FGL's 2013 IPO**

189.     In December 2013, FGL, a wholly-owned subsidiary of Harbinger and owner of F&G Insurance, announced an initial public offering of 9,750 thousand shares of common stock at a price to the public of $17 per share, or $165.8 million.  The shares began trading on the NYSE on December 13, 2013 under the ticker symbol "FGL."  After the IPO, Harbinger held 47,000 thousand shares of FGL's outstanding common stock, representing an 80.7% interest.

190.     In conjunction with the initial public offering, on November 7, 2013, FGL's board of directors adopted a long term stock-based incentive plan (the "FGL 2013 Stock Incentive Plan") under which certain officers, employees, directors and consultants are eligible to receive equity based awards.  The FGL 2013 Stock Incentive Plan was approved by the stockholders on November 19, 2013, became effective on December 12, 2013, and expires in December 2023.

191.     FGL's compensation committee approved the granting of awards under the FGL 2013 Stock Incentive Plan to certain employees, officers and directors (other than the members of the compensation committee).

192.     In addition, FGL's board of directors approved the granting of awards to members of FGL's compensation committee.  The awards made to members of the FGL's compensation committee were not made under the FGL 2013 Stock Incentive Plan; however, these awards will be construed and administered as if subject to the terms of the FGL 2013 Stock Incentive Plan. FGL's board of directors and stockholder, Harbinger, also approved the granting of unrestricted common shares to its directors in lieu of cash compensation at the election of each individual director.

## VI.     PLAINTIFF'S PURCHASE OF AN F&G INSURANCE ANNUITY

193.     Plaintiff in September 2013 purchased an F&G Insurance "Simplicity Elite 14" annuity based on F&G Insurance's express and implied representations of its positive surplus and financial stability.

194.     In its "Corporate Spotlight" brochure given to Plaintiff (*see* Exhibit A), F&G Insurance marketed its annuity products under the banner "SAFETY," and not only emphasized its "Solid Rating Reviews," including "A.M. Best B++ for financial strength," but also represented as of December 31, 2012 a purported "Statutory Capital and Surplus" of $900 million and an RBC of 406%.

195.    Plaintiff gave consideration of $68,832.15 for the F&G Insurance annuity, which in turn obligated F&G Insurance to make future monthly annuity payments to her.

196.    Plaintiff would not have purchased the F&G Insurance annuity had she known F&G Insurance's true financial condition, including in particular its negative surplus situation.

197.    The F&G Insurance annuity sold to Plaintiff was worth significantly less than represented given F&G Insurance's true financial condition.  Indeed, upon information currently available, Plaintiff on the date she purchased the F&G Insurance annuity sustained damages of $6,256 – suffering an immediate loss of as much as 9.09% of her principal investment proximately caused by the Defendants' fraudulent scheme.  The out-of-pocket damages that Plaintiff sustained immediately on the date of purchase are manifested through past and future account values lower than the amounts that F&G Insurance would have credited to her annuity account if it had compensated her for the undisclosed increased risks resulting from F&G Insurance's misconduct, as alleged above.  These concrete damages attributable to the shortfall in account values associated with F&G Insurance's undisclosed financial weaknesses are made certain by the hefty surrender charges Plaintiff would incur upon surrender of her annuity, which effectively lock her into the risky annuity for many future years.

198.    Plaintiff has standing to assert her RICO claims against Defendants because she is a person who has suffered injury to her business or property by reason of the Defendants' alleged RICO violations.

199.    Plaintiff's injury (1) is in the form of direct, concrete financial loss that occurred upon her purchase of the F&G Insurance annuity and thereafter, (2) is ripe, and (3) is not contingent on future events that may or may not occur.

200.     Defendants used interstate mail and wire to transmit and receive a variety of materials to effectuate the sale of the F&G Insurance annuity to Plaintiff.  Defendants also used the mail and wire to process Plaintiff's F&G Insurance annuity application, process the premium payment, and pay the commission from the sale of the annuity.   In particular, Plaintiff received telephonic solicitations to purchase the F&G Insurance policy, and her application was mailed or wired to F&G Insurance in August 2013.  Plaintiff also received in the mail a welcome letter from the President of F&G Insurance shortly after purchasing the annuity, stating in part:

> It is a pleasure to welcome you to our growing family of Fidelity & Guaranty annuity customers.  Your recent purchase shows you recognize the importance of annuities in planning for a secure feature… Fidelity & Guaranty Life Insurance Company – headquartered in Baltimore, Maryland – offers a diverse portfolio of annuities and life insurance products to help families and businesses achieve secure financial futures … Again, thank you for your expression of confidence in our Company.

A true and accurate copy of the F&G Insurance welcome letter is attached as Exhibit D.

201.     Plaintiff did not, however, know or suspect that. at the time she purchased her F&G Insurance annuity, and continuing through the present, F&G Insurance has grossly misrepresented its positive surplus available to satisfy its obligations to its annuity holders, causing Plaintiff to purchase an annuity product that was far riskier and thus worth far less than represented.

## VII.     RICO ALLEGATIONS

202.     As set forth above, Defendants acted in concert to defraud and overcharge Plaintiff and individuals who purchased annuities from F&G Insurance during the Class Period in violation of the civil provisions of the Racketeer Influences and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968.

A.     **Standing, Injury, and Proximate Cause**

203.     Plaintiff and the members of the putative Class are each "persons" within the meaning of 18 U.S.C. § 1961(3).

204.     Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

205.     Plaintiff and each member of the putative Class have sustained injury to their business or property by reason of the acts and the conduct of Defendants alleged in this Complaint, including their loss of money due to their overpayment at the time of sale for the annuity products sold to them during the Class Period by the F&G Insurance.

206.     Plaintiff and the other members of the proposed Class suffered concrete damages on the date they purchased their annuities from F&G Insurance and thereafter.  Plaintiff and the Class members purchased one or more annuities that were worth far less than the premiums paid as a direct result of the unlawful practices alleged herein and each of them incurred an immediate, measurable financial loss on the purchase date equal to the difference between the premiums paid and the diminished value attributable to the F&G Insurance's undisclosed adverse financial condition and default risk.  For example, Plaintiff on the date she purchased the F&G Insurance annuity sustained damages of at least $6,256 – an immediate loss of as much as 9.09% of her principal investment representing the difference between the premium paid and the diminished value of the annuity she acquired.  In addition, to the extent that Plaintiff and other Class members surrender their annuities before expiration of the pertinent surrender charge period, they will sustain additional damages in the form of surrender charges.

207.     Furthermore, Plaintiff and the other members of the Class suffered concrete damages in the form of interest and/or index credits and resulting account values lower than those that they would have received if F&G Insurance had compensated them for the undisclosed financial risks that F&G Insurance concealed through the manipulative practices alleged above.

- 49 -

208.     But for the conduct of Defendants alleged in this Complaint, Plaintiff and the putative Class would not have been injured.

209.     The loss suffered by Plaintiff and each member of the class was proximately caused by Defendants, as the alleged fraudulent scheme and enterprise was a direct and substantial factor in causing their injury.  As in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), the injury suffered by Plaintiffs and each member of the Class here was "a foreseeable and natural consequence of [Defendants'] scheme" to continue selling annuity products based on misrepresentation of F&G Insurance's positive surplus and financial stability and selling annuity products at a price much greater than they were actually worth.  Moreover, there are no victims beyond Plaintiff and the putative Class more directly injured by Defendants' scheme and illegal enterprise who can be counted on to seek remedies under RICO.

210.     The harm suffered by Plaintiff and each member of the Class amounts to compensable injury caused by Defendants' conduct of an enterprise through a pattern of racketeering.  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985).

211.     Plaintiff and the Class were the targets of the RICO scheme.  They purchased annuities issued by F&G Insurance based on false express and implied representations of positive surplus and financial stability and paid an inflated price for those annuities based on those representations.  Plaintiff and the Class would not have purchased the annuities had they known F&G Insurance's true financial condition, including in particular its negative "surplus" situation.

212.     In addition, Plaintiffs and each member of the Class were injured by the overt acts taken by the Defendants in furtherance of their conspiracy to violate Section 1962(c) which are themselves predicate acts, including the generation of bogus reinsurance credits used to depict

F&G Insurance as having positive surplus when it was actually hiding liabilities through a series of fraudulent transactions with its affiliated captive insurance companies and fraudulently overstating assets in violation of statutory accounting rules.

## B. The Alleged Associated-in-Fact RICO Enterprise

213. The following group of individuals associated-in-fact as an "enterprise" within the meaning of 18 U.S.C. § 1961(4) to conceal the true financial condition of F&G Insurance through the use of fraudulent accounting machinations so that F&G Insurance could improperly market and sell F&G Insurance annuity products during the Class Period, could mislead consumers like Plaintiff and putative class members into purchasing annuities at inflated prices, and so that Harbinger and Falcone could extract dividends from the company:

- Falcone;

- Harbinger;

- F&G Insurance;

- Raven Re;

- Front Street Re (Cayman);

- Wilton;

- Wilton Re; and

- Wilton Re Bermuda.

This association-in-fact is referred to herein as the "RICO Enterprise."

214. As set forth herein, the RICO Enterprise has an ascertainable structure that is separate and distinct from the persons that constitute the enterprise, and it is separate and apart from the pattern of racketeering activity alleged herein.

215. As alleged more fully below, Defendants conducted affairs of the RICO Enterprise through a pattern of racketeering activity. Defendants fraudulently concealed and conspired to fraudulently conceal material information about: (1) the true negative surplus condition and financial instability of F&G Insurance, and (2) the true value of F&G Insurance's annuity products.

216. As a direct result of this fraudulent scheme, Defendants were able to and did charge Plaintiff and the Class excessive prices for F&G Insurance's annuity products. As a direct result of the fraudulent conduct, Harbinger and Falcone were able to raid F&G Insurance of its short term cash thus undermining F&G Insurance's ability to perform its obligations to annuity holders like Plaintiff and injuring them by rendering their annuities far more risky.

217. The alleged RICO Enterprise has a sufficiently ascertainable structure in that it has (1) a purpose, (2) relationships among the associates, and (3) longevity sufficient to achieve its purpose. *Boyle v. United States*, 129 S. Ct. 2237 (2009).

### 1. Purpose of the RICO Enterprise.

218. The RICO Enterprise is an ongoing and continuing organization of companies associated for the common or shared purpose of defrauding consumers by concealing the negative surpluses and financial instability of F&G Insurance so that Defendants could continue to market and sell the annuity products through F&G Insurance, to sell annuity products to consumers at inflated prices, and to siphon the short term cash earned by sales of these products by paying improper dividends to Harbinger and Falcone.

### 2. Relationships among Separate and Distinct Associates.

219. To pull off the reinsurance shell game and purport to move liabilities off F&G Insurance's statutory balance sheet and otherwise give it the appearance of financial strength, Defendants had to create and operate Raven Re and Front Street Cayman as distinct subsidiaries

- 52 -

(wholly owned captive insurance companies), Wilton had to create Wilton Re Bermuda (a wholly owned captive insurance company), and Defendants had to utilize the unaffiliated but complicit Wilton Re to move liabilities off the F&G Insurance balance sheet, falsely inflate surplus, and hide massive liabilities that would render F&G Insurance insolvent.

220. The special purpose financial captives, Raven Re and Front Street Cayman, and Wilton Re formed the heart of the scheme and, because their finances are not publically disclosed under state law, these entities enabled the RICO Enterprise's unlawful activity to violate statutory accounting requirements, hide liabilities, artificially inflate surplus, misstate RBC, and improperly pay dividends while fraudulently misrepresenting the financial strength of F&G Insurance in order to sell annuities at inflated prices.

221. Defendants' use of Raven Re, Front Street Cayman and Wilton Re made it easier to commit and conceal the RICO Enterprise's fraudulent activities and purpose, because it allowed the generation of phony reserve credits through circular, non-economic reinsurance transactions between entities as well as the protection of state laws that allowed the finances of the captive insurance companies to be kept secret.

222. The RICO Enterprise's decision to operate through Raven Re, Front Street Cayman and Wilton Re thus facilitated its unlawful activity. Defendants consciously used the separate corporate forms of the Raven Re, Front Street Cayman, and Wilton Re in order to make the fraudulent scheme harder to detect and better conceal the nature and extent of their misrepresentations and wrongdoing

223. Each associate of the RICO Enterprise has an existence separate and distinct from its participation in the racketeering activities of the RICO Enterprise. Each alleged corporate

associate is organized as a separate company, with separate boards, separate books and records, separate accounts and separate existences for legal and regulatory purposes.

224.    The RICO Enterprise has an existence and structure that is separate and distinct from other affairs of its members.  Members of the RICO Enterprise engage in business operations separate and apart from their activities on behalf of the RICO Enterprise.  For example:

– Harbinger is a diversified holding company seeking to acquire and to grow businesses that generate sustainable free cash flow.  In addition to its ultimate ownership interest in F&G Insurance, Harbinger is the majority stockholder of Spectrum Brands, a consumer products company that supplies batteries, residential locksets, faucets, shaving and grooming products, household appliances, personal care products, pet supplies and pest control products. Harbinger also owns and operates Salus Capital Partners (a lender focusing on asset-backed loans to mid-market borrowers), Compass Production GP, LLC (a joint venture formed to originate private oil and gas partnerships), and Energy & Infrastructure Capital (an institutional investor focusing on global energy markets).

– Falcone is a businessman with varied investment interests beyond F&G Insurance, including a telecommunications company known as Lightsquared. Falcone is subject to a consent decree with the United States Securities and Exchange Commission ("SEC") barring him from acting as or associating with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization.

- 54 -

- F&G Insurance is an insurance company selling life insurance and annuity products around the United States.

- Wilton is a holding company that provides life insurance and life reinsurance products. It offers traditional life reinsurance products, such as term products, universal and variable universal life, whole life products, immediate annuities, deferred annuities, and equity indexed annuities; simplified issue products for the underserved middle market, worksite sales, and alternative distribution arrangements; run off solutions to allow exits from business that is no longer vital to a clients' continued growth and success; and longevity solutions. Wilton provides these products and services to clients and customers other than F&G Insurance.

- Wilton Re is a U.S. life (re)insurance company specializing in the acquisition of in-force life insurance and annuities and with assisting life insurance clients with product development, underwriting, and new business strategies designed to serve the middle market. Wilton Re has reinsurance relationships with companies other than F&G Insurance.

- Front Street Cayman has also diversified into reinsurance transactions with non-affiliates; Harbinger and Front Street Cayman, for example, recently announced a reinsurance arrangement with unaffiliated Bankers Life Insurance Company, retroactive to November 30, 2013.[10]

225. Defendants became associated with the RICO Enterprise and conducted or participated in the affairs of the RICO Enterprise to further the purpose of the RICO Enterprise

---

[10] http://www.harbingergroupinc.com/phoenix.zhtml?c=118763&p=irol-newsArticle&ID=1885613&highlight=

in addition to their own affairs. The activities engaged in by the associates of the RICO Enterprise facilitating the racketeering activities are not, however, ordinary legitimate business activities and, in fact, were unlawful and would be inimical to the interests of the RICO Enterprise members if detected, understood, and challenged by regulatory or law enforcement officials.

226. Each member of the RICO Enterprise has a clearly defined role and relationship in the conduct of the affairs of the RICO Enterprise and, as alleged above, all of the associates took some part in directing the RICO Enterprise's affairs.

227. As more fully set forth above, Harbinger and Falcone orchestrated the operation, entered into a contract with Wilton to use Wilton Re and its wholly owned captive to absorb over $1.7 billion in liabilities from F&G Insurance without the corresponding assets to match those liabilities so that F&G Insurance would appear to be financially stable, sell life and annuity products at inflated prices, and pay upstream dividends to Harbinger and Falcone. Harbinger and Falcone participated in and, in part, directed the affairs of the RICO Enterprise from at least 2011 to present.

228. As more fully set forth above, F&G Insurance coordinated the transfer of current liabilities off its Annual Statements to entities like Raven Re, Front Street Cayman, and Wilton Re in order to inflate its reported surplus, enhance its reported RBC and misstate its financial stability. F&G Insurance engaged in fraudulent accounting practices that violated statutory accounting requirements so as to give the false impression of positive surplus and financial stability, while continuing to market its annuity products to unsuspecting consumers at inflated prices. F&G Insurance participated in and, in part, directed the affairs of the RICO Enterprise from at least 2011 to present.

229. Raven Re was formed for the purpose of hiding F&G Insurance's liabilities and facilitating Defendants fraudulent accounting schemes in 2011 and has served as a corrupt entity affiliated with F&G Insurance that was created to accept ceded liabilities from F&G Insurance despite its lack of independent payment ability from 2011 to present. Raven Re used the state statutes shielding its finances from public disclosure to hide F&G Insurance's liabilities from 2011 to present. The existence of captives like Raven Re allowed Defendants to conceal the RICO Enterprise's fraudulent scheme.

230. As more fully set forth above, on January 26, 2011, Wilton entered into a Commitment Agreement with Harbinger committing Wilton Re, a wholly owned subsidiary of Wilton and a Minnesota insurance company, to enter into two amendments to its existing coinsurance agreements between Wilton Re and F&G Insurance whereby F&G Insurance would cede its liabilities to Wilton Re. Wilton authorized and directed its wholly owned subsidiaries to participate in the RICO Enterprise designed to misstate the financial stability of F&G Insurance to mislead annuity purchasers, misled ratings agencies, misled regulators and misled Plaintiff in this matter as to the true financial condition of F&G Insurance. Wilton obligated Wilton Re to participate in the RICO Enterprise, and Wilton Re acted on that obligation from 2011 to present.

231. As more fully set forth above, starting on April 26, 2011, and continuing to present, Wilton Re served as an entity unaffiliated with F&G Insurance that agreed to accept ceded liabilities from F&G Insurance in a series of non-arms-length transactions that allowed the Defendants and the RICO Enterprise to create false surplus for F&G Insurance through improper reserve discounting. Wilton Re agreed to accept over $1.7 billion in liabilities from F&G Insurance with only a corresponding transfer of $1.15 billion in assets to cover those liabilities. Wilton Re made these transactions knowing that it was not adequately capitalized to absorb such

a risk. Indeed, at the time Wilton Re was simply turning around and dumping its liabilities into its own affiliated captive reinsurer in Bermuda, Wilton Re Bermuda, and would have had a negative surplus of its own absent these suspect accounting transactions.

232.     As more fully set forth above, beginning in 2011 and continuing to present, Wilton Re Bermuda, a captive reinsurer affiliated Wilton Re and within the same holding company system, was used to transfer massive amounts of liabilities off the books of Wilton Re and shield them in an entity whose finances are not publically available. For example, in 2011, at the height of the RICO Enterprise's fraudulent accounting schemes, Wilton Re Bermuda absorbed over $1.4 billion in liabilities from Wilton Re into its "black box" in Bermuda.

233.     In these ways and all the others more fully set forth above, each of the associates of the RICO Enterprise – including specifically each of the Defendants – directly or indirectly participated in, or managed aspects of, facilitated or otherwise took some part in and had significant control over directing the unlawful activities comprising the RICO Enterprise's affairs.

234.     The cooperation exhibited by the members of the RICO Enterprise fell outside the bounds of the parties' normal commercial relationships and was undertaken to advance the corrupt purposes of the RICO Enterprise.

**3.     Continuous Existence.**

235.     The RICO Enterprise has had an ongoing and continuous existence during the Class Period defined below sufficient to permit the Defendants to pursue the RICO Enterprise's purpose. Throughout the Class Period, the members of the RICO Enterprise associated in fact to disguise the financial condition of F&G Insurance in order to market and sell F&G Insurance's annuity products at an inflated price, deceive ratings agencies and regulators, and siphon the cash out of F&G Insurance to Harbinger and Falcone by improperly paying dividends on an ongoing

rather than *ad hoc* basis. None of the Defendants acted independently or in competition with one another, or otherwise in a manner contrary to the RICO Enterprise's purpose.

236.    The phony reserve credits reported by F&G Insurance were not generated independently and without coordination; to the contrary, the fundamental circularity of the non-economic reinsurance transactions could only have been accomplished with the coordination and cooperation of each member of the RICO Enterprise. No associate of the RICO Enterprise could have accomplished the goals of Defendants' liability-dumping scheme on its own initiative.

237.    As described more fully above, during the Class Period, each associate in the RICO Enterprise was aware of the scheme to misstate F&G Insurance's true financial condition and was a knowing and willing participant in that scheme.

238.    The RICO Enterprise has displayed a continuity of membership during the Class Period exceeding two years, during which time Defendants acted continuously in their respective roles in the RICO Enterprise.

239.    And there is a very real threat of continued misconduct. Six months into 2014, F&G Insurance's Quarterly Financial Statements indicate that Defendants' pattern and practice is continuing. Indeed, F&G Insurance's sales of annuities (and thus its long term liabilities) are growing dramatically. In all of 2013 alone, premiums from annuity products totaled $1.7 billion. Just six months into 2014, F&G Insurance has taken in $1.32 billion in premiums, on pace to increase its premiums on annuities by 77%.

C.    **Interstate Commerce**

240.    The RICO Enterprise engages in and affects interstate commerce because it involves activities across state boundaries, such as the fraudulent marketing, promotion, advertisement and sale of F&G Insurance's annuity products, the receipt of inflated annuity payments from such fraudulent sales, and the transmission of false financial statements to the

respective state regulators and to the NAIC and the transmission of false annual statements, notices and other false information to annuity owners located throughout the United States.

### D.     Predicate Acts of Racketeering

241.     Section 1961(1)(B) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth below, Defendants have engaged and continue to engage in conduct violating each of these laws to effectuate their scheme.

242.     For the purpose of executing and/or attempting to execute the above-described scheme to misstate F&G Insurance's financial condition in order to sell F&G Insurance's annuity products and for Harbinger and Falcone to siphon money out of F&G Insurance by concealing its negative surplus and financial instability, which if disclosed, would reveal these annuity products to be inferior to alternative investments, Defendants, in violation of 18 U.S.C. §§ 1341 and 1343, committed repeated acts of mail and wire fraud.

243.     Specifically, in each of the years from 2011 to 2013, Defendants participated in a fraudulent accounting scheme to hide the true financial condition of F&G Insurance. Annual Statements containing F&G Insurance's misstated financial condition were then transmitted both over the wires and the mail to the following entities in violation of 18 U.S.C. § 1341 and 1343 to:

(a)     the NAIC;

(b)     regulators in each state in which F&G Insurance does business; and

(c)     ratings agencies such as AM Best.

244.     As alleged above, the 2011-2013 Annual Statements submitted by F&G Insurance to the NAIC and its respective regulators included fraudulent representations of, among other things, positive surplus and enhanced RBC. Similarly false was each Annual and Quarterly Statement filed by F&G Insurance after its 2011 Annual Statement.

245.    Additionally, F&G Insurance was required to, and upon information and belief, did submit by both the mail and/or the wires its marketing materials to governing regulators in its state of domicile.  Because of Defendants scheme to misstate the financial condition of F&G Insurance, those marketing materials contained numerous misstatements regarding the financial condition of F&G Insurance designed to deceive the consumers into purchasing F&G Insurance products and to deceive regulators regarding F&G Insurance's true financial condition in violation of 18 U.S.C. §§ 1341 and 1343.

246.    For the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things, which include, but are not limited to, marketing brochures, consumer brochures, annuity applications, annuity disclosure forms, field memos, correspondence, prospective lead lists, annuity payments and commission payments, reports, data, summaries, account statements, faxes, other annuity marketing and sales materials, and wire transfers by and among affiliates for purposes of moving liabilities off balance sheet.  In addition, pursuant to and as part of the scheme to defraud, Defendants intended to and did receive payments from Plaintiffs and other Class members that were transmitted or cleared through the use of interstate wires in violation of 18 U.S.C. § 1343.

247.    For the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. § 1341, transmitted and received by mail, matter and things, which include, but are not limited to, marketing brochures, consumer brochures, annuity applications, annuity disclosure forms, field memos, correspondence, prospective lead lists,

annuity payments and commission payments, reports, data, summaries, account statements, faxes, other annuity marketing and sales materials, and wire transfers by and among affiliates for purposes of moving liabilities off balance sheet. In addition, pursuant to and as part of the scheme to defraud, Defendants intended to and did receive payments from Plaintiffs and other Class members that were transmitted or cleared through the use of interstate mail in violation of 18 U.S.C. § 1341.

248.    For example, F&G Insurance's internet website prominently lists the Company's ratings by various services, including its B++ rating by A.M. Best which, according to the website means that F&G Insurance has "a good ability to meet their ongoing insurance obligations."[11] F&G Insurance's corporate website also represents to prospective and existing policyholders that F&G Insurance "embraces a long-term investment philosophy designed to generate competitive returns while weathering challenging economic conditions" and that its "investment portfolio is well positioned to protect our policyholders' families and guarantee predictable income when they retire."[12] These representations are and were false when made, for the reasons alleged above.

249.    F&G Insurance's consumer brochures, which are posted on the Company's website and distributed through the mails to agents and prospective purchasers, contain similar materially false representations concerning the financial stability of F&G, the adequacy of its reserves, and its ability to meet its long-term obligations to policyholders. It was foreseeable, for example, to Defendants that the mails would be used to supply the "Corporate Spotlight" brochure containing material falsehoods to its agents for ultimate distribution to Plaintiff and

---

[11] http://home.fglife.com/about-fgl/ratings

[12] http://home.fglife.com/about-fgl/investment-portfolio

other prospective F&G Insurance annuity purchasers.  Similarly, the brochure for the Simplicity

Elite 14 annuity purchased by Plaintiff posted on F&G Insurance's website states:

> "Fixed annuities are subject to individual and state reserve and other requirements…All guarantees are based on the claims-paying ability of Fidelity & Guaranty Life Insurance Company.
>
> ***
>
> This annuity is designed for people who intend to use their assets for guaranteed lifetime income… ***Your annuity values are guaranteed by Fidelity & Guaranty Life.  As a legal reserve company, Fidelity & Guaranty Life is required by state regulation to maintain reserves equal to or greater than guaranteed surrender values.***
>
> ***
>
> Incorporated in 1959, Fidelity & Guaranty Life Insurance Company has a solid commitment to serving individuals it knows best – middle market consumers seeking the ***safety, protection, accumulation and income features of secure life insurance and annuity products***.[13]

250.     Many of the precise dates of Defendants' fraudulent uses of the U.S. Mail and

wire facilities have been deliberately hidden and cannot be alleged without access to Defendants'

books and records.  Indeed, the success of Defendants' scheme depends upon concealment, and

Defendants have withheld details of their scheme from Plaintiff and Class members.  Generally,

however, Plaintiff can describe the occasions on which the predicate acts of mail and wire fraud

occurred, and how those acts were in furtherance of a scheme.  They include thousands of

communications to perpetuate and maintain the scheme, including, among other things:

- transmitting and receiving promotional materials, consumer brochures, agent training materials and website postings extolling and falsely representing  F&G Insurance's purportedly positive surplus, stable financial condition and favorable A.M. Best rating obtained through false representations;

---

[13] http://home.fglife.com/annuities/simplicity-elite-series (emphasis added).

- transmitting false financial statements to the respective state regulators and to the NAIC (including the 2011-2013 Annual Statements excerpted above in this Complaint);

- sharing information with sales agents about prospective purchasers of the F&G Insurance annuity products;

- processing applications for F&G Insurance annuity products; and

- processing premium payments received from the annuity holders, including those of Plaintiff.

In particular, Plaintiff received telephonic solicitations to purchase the F&G Insurance policy, and her application was mailed or wired to F&G Insurance in August 2013. F&G Insurance received payment by mail or wire in September 2013. Plaintiff thereafter received in the mail a welcome letter from F&G Insurance shortly thereafter, a true and accurate copy of which is attached as Exhibit D.

251.    The materials sent or received by Defendants via the U.S. Mail, commercial carrier, wire, or other interstate electronic media, contained, *inter alia*, fraudulent material misrepresentations and omissions about the undisclosed risks of F&G Insurance's annuity products, including the risk of default given F&G Insurance's negative surplus and financial instability, calculated to deceive persons of ordinary prudence and comprehension. Defendants used "dishonest methods or schemes" involving "the deprivation of something of value by trick, deceit, chicane or overreaching." *McNally v. United States*, 483 U.S. 350, 358 (1987) (quotation omitted).

252.    Defendants' corporate headquarters has communicated by U.S. Mail, email and by facsimile with each of the alleged associates in the RICO Enterprise and with their various regional offices, subsidiaries, and affiliates in furtherance of their scheme.

253.     Defendants' omissions of material facts, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving Plaintiff and the Class into purchasing overpriced F&G Insurance annuity products.

254.     Defendants either knew or recklessly disregarded the fact that their omissions and misrepresentations were material and were relied upon by Plaintiff and the Class as shown by their payments for the F&G Insurance annuity products.

255.     Although not necessary to make out a violation of RICO or the mail or wire fraud statutes, *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), Plaintiff and the Class relied to their detriment on Defendants' fraudulent material omissions and misrepresentations of F&G Insurance's true financial condition, which were made by means of Web sites, mass mailings, newspaper advertisements, telephone calls, marketing materials, and virtually uniform representations or omissions.

256.     Moreover, Defendants were through their fraudulent scheme able to charge more across-the-board for the F&G Insurance annuity products.  So long as at least some class members were induced into purchasing the F&G Insurance annuity products in reliance on the alleged misrepresentations, the price of these annuities would be greater for everyone in the class, even for those class members who did not rely on the misrepresentations.  With at least some class members relying on the false representations, F&G Insurance would be able to charge more for its products because a subset of consumers rationally believed they would receive all that was promised to them.  As such, other class members who did not rely on these representations would also be harmed, because the reliance of some class members would allow Defendants to increase the price of the product for all—thereby overcharging all class members. In other words, even class members who did not rely on the misrepresentations nonetheless

suffered an out-of-pocket loss by being overcharged for the F&G Insurance annuities, notwithstanding any lack of reliance on the alleged misrepresentations.

257.    Defendants knew Plaintiff and the Class relied on their misrepresentations and omissions concerning the true financial condition of F&G Insurance, and knew that purchasing annuitants would incur substantial loss as a result.

258.    Accordingly, Defendants have obtained money and property belonging to the Plaintiff and Class Members, and Plaintiff and the members of the Class have been injured in their business or property by Defendants' overt acts of mail and wire fraud.

**E.    Pattern of Racketeering Activity**

259.    As alleged above, Defendants have consistently violated the governing reporting requirements with respect to their reporting of F&G Insurance's financial condition—including SSAP 4, 15 and 25—filing Annual Statements for each year (and for intervening quarters) that, among other things, fraudulently misrepresented their statutory surplus as positive.

260.    Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing at least two acts of racketeering activity, *i.e.*, indictable violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud) as described above, within the past three years.

261.    In fact, Defendants have committed countless of acts of racketeering activity, including the misreported financial condition to state regulators, the NAIC, ratings agencies and the public for each year during the Class Period.  Each racketeering act was related, had a similar purpose (described above), involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including the Plaintiff and other members of the Class.

262.     The multiple predicate acts of racketeering activity that Defendants committed

and/or conspired to commit were related to each other and amount to and pose a threat of

continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as

defined in 18 U.S.C. § 1961(5).

## VIII.   CLASS ALLEGATIONS

263.     Plaintiff brings this action on behalf of herself and all other similarly situated

Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure

and seeks certification of the following Class ("the Class") for violations of federal laws and

declaratory judgment:

> All persons in the United States who between April 6, 2011 and
> the date class notice is disseminated purchased an annuity product
> issued by F&G Insurance.

Excluded from the Class are Defendants and their officers, directors and employees.

264.     ***Numerosity***.  The members of the Class are so numerous that individual joinder of

all members is impracticable.  In 2013 alone, F&G Insurance received in excess of $1.7 billion in

annuity payments.  The identity and precise number of Class members, though unknown to

Plaintiff, is reasonably ascertainable from F&G Insurance's records.

265.     ***Commonality and Predominance.***  This action involves common questions of

law and fact, which predominate over any questions affecting individual Class members.  These

common legal and factual questions include, but are not limited to, the following:

> (a)     the nature and validity of F&G Insurance's liabilities ceded
> to Raven Re;
>
> (b)     the nature and validity of F&G Insurance's liabilities ceded
> to Wilton Re;
>
> (c)     the nature and validity of Wilton Re's insurance ceded to
> Wilton Re Bermuda;

- 67 -

(d)     the nature and validity of F&G Insurance's liabilities ceded
        to Front Street Cayman;

(e)     the propriety of the statutory accounting for the reinsurance
        ceded by F&G Insurance;

(f)     the true financial condition and statutory solvency of the
        F&G Insurance once the ceded reinsurance is properly
        accounted for;

(g)     the accuracy of F&G Insurance reporting of its MBS and
        other "toxic" assets;

(h)     whether Defendants engaged in mail and/or wire fraud;

(i)     whether Defendants engaged in a pattern of racketeering
        activity;

(j)     whether the alleged RICO Enterprise is an "enterprise"
        within the meaning of 18 U.S.C. §1961(4);

(k)     whether Defendants conducted or participated in the affairs
        of the RICO Enterprise through a pattern of racketeering
        activity in violation of 18 U.S.C. §1962(c);

(l)     whether Plaintiff and the Class members are entitled to
        appropriate equitable remedies, including declaratory and
        injunctive relief; and

(m)     whether Plaintiff and the Class are entitled to monetary
        damages, including treble damages under federal RICO
        law.

266.    *Typicality*.  Plaintiff's claims are typical of the claims of the members of each

Class because, *inter alia*, all Class members were injured through the same alleged uniform

misconduct described above.

267.    *Adequacy of Representation*.  Plaintiff will fairly and adequately protect the

interests of the members of each Class.  Plaintiff has retained counsel experienced in complex

consumer class action litigation, and Plaintiff intends to prosecute this action vigorously.

Plaintiff has no interests adverse or antagonistic to those of the Class.

268.    *Superiority*.  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants.  It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them.  Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

269.    *Propriety of Injunctive and Declaratory Relief.*  Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## IX.    CAUSES OF ACTION

### COUNT ONE
### (Violation Of The Racketeer Influenced And Corrupt
### Organizations Act, 18 U.S.C. Section 1962(c))

270.    Plaintiff and the Class repeat and re-allege all allegations contained in the paragraphs above as if set forth separately in this Claim for Relief.

271.    This claim arises under 18 U.S.C. § 1962(c), which provides in relevant part:

> It shall be unlawful for any person employed by or associated with
> any enterprise engaged in, or the activities of which affect,
> interstate or foreign commerce, to conduct or participate, directly

or indirectly, in the conduct of such enterprise's affairs through a
pattern of racketeering activity ….

272.     In violation of 18 U.S.C. § 1962(c), Defendants have conducted or participated,

directly or indirectly, in the conduct of the affairs of the RICO Enterprise through a "pattern of

racketeering activity," as defined by 18 U.S.C. § 1961(5).  Therefore, Defendants have violated

18 U.S.C. § 1962(c).

273.     The injuries of Plaintiff and the Class were directly and proximately caused by

Defendants' racketeering activity.  Moreover, reliance by at least some of the purchasers of the

F&G Insurance annuity products allowed the Defendants to charge an excessive price for the

annuity products, injuring all those who purchased them during the Class Period.

274.     As a result and by reason of the foregoing, the Plaintiff and Class Members have

been injured, suffered harm and sustained damage to their business and property, and are

therefore entitled to recover actual and treble damages, and their costs of suit, including

reasonable attorney fees, pursuant to 18 U.S.C. § 1964(c).

**COUNT TWO**
**(Violation of the Racketeer Influenced and Corrupt**
**Organizations Act, 18 U.S.C. Section 1962(d))**

275.     Plaintiff and the Class repeat and re-allege all allegations contained in the

paragraphs above as if set forth separately in this Claim for Relief.

276.     This claim arises under 18 U.S.C. § 1962(d), which provides in relevant part:  "It

shall be unlawful for any person to conspire to violate any of the provisions of subsection …(c)

of this section."

277.     In violation of 18 U.S.C. § 1962(d), Defendants conspired to defraud the Plaintiff

and other Class Members of their money and property through the sale of overpriced annuity

products pursuant to the pattern of racketeering activity and the scheme described above.

- 70 -

Defendants agreed to conduct or to participate in the affairs of the RICO Enterprise and agreed to commit at least two of the predicate acts identified above.

278.    The injuries of Plaintiff and the Class were directly and proximately caused by Defendants' racketeering activity.  Moreover, reliance by at least some of the purchasers of the F&G Insurance annuity products allowed the Defendants to charge an excessive price for those annuity products, injuring all those who purchased them during the Class Period.

279.    As a result and by reason of the foregoing, the Plaintiff and Class Members have been injured, suffered harm and sustained damage to their business and property, and are therefore entitled to recover actual and treble damages, and their costs of suit, including reasonable attorney fees, pursuant to 18 U.S.C. § 1964(c).

## COUNT THREE
### (Injunctive and Declaratory Relief)

280.    Plaintiff and the Class repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

281.    As set forth above, Defendants have violated 18 U.S.C. §§ 1962 (c), and (d), and will continue to do so in the future.  Enjoining Defendants from committing these RICO violations in the future and/or declaring their invalidity is appropriate pursuant to 18 U.S.C. § 1964(a), which authorizes the district courts to enjoin violations of 18 U.S.C. § 1962.  *Huyer v. Wells Fargo & Co.*, 295 F.R.D. 332 (S.D. Iowa 2013).

282.    In addition, an actual controversy has arisen and now exists between Plaintiff and F&G Insurance as to the propriety of the statutory accounting methods used to establish the statutory solvency of F&G Insurance.

283.    Under the circumstances, Plaintiff is entitled to a declaration (1) that the statutory accounting methods of F&G Insurance challenged in this suit do not comply with SAP, (2) that

the non-compliant accounting methods must be reversed, and (3) that the statutorily required reserves must be established by F&G Insurance using assets that are properly deemed admitted.

## PRAYER

WHEREFORE, Plaintiff prays for a judgment:

A.     Certifying the Class as requested herein;

B.     Awarding Plaintiff and Class members compensatory damages, trebled, in an amount to be determined at trial;

C.     Awarding Plaintiff declaratory and injunctive relief;

D.     Awarding Plaintiff and Class members attorneys' fees and costs; and

E.     Affording Plaintiff and Class members with such further and other relief as deemed just and proper by the Court.

## JURY DEMAND

Plaintiff demands a jury trial of all issues triable by right by jury.

DATED:  January 7, 2015

By:    */s/Diane A. Nygaard*
Diane A. Nygaard (Mo. Bar No. 47240)
Kenner Nygaard DeMarea Kendall, LLC
117 W. 20th St., Suite 201
Kansas City, MO. 64108
Tel: 816-531-3100 |
Fax: 816-531-3600
E-mail:  diane@kndklaw.com

Steve W. Berman (to be admitted *Pro Hac Vice*)
Sean R. Matt (to be admitted *Pro Hac Vice*)
Hagens Berman Sobol Shapiro LLP
1918 Eighth Ave., Suite 3300
Seattle, WA 98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
E-mail: steve@hbsslaw.com
E-mail: sean@hbsslaw.com

Andrew S. Friedman (to be admitted *Pro Hac Vice*)
Francis J. Balint, Jr. (to be admitted *Pro Hac Vice*)
Bonnett, Fairbourn, Friedman & Balint, P.C.
235 East Camelback Road
Suite 300
Phoenix, AZ  85016
Telephone:  (602) 274-1100
Facsimile:  (602) 274-1199
E-mail:  afriedman@bffb.com
E-mail:  fbalint@bffb.com

Erin Dickinson (to be admitted *Pro Hac Vice*)
Chuck Crueger (to be admitted *Pro Hac Vice*)
Hansen Reynolds Dickinson Crueger LLC
316 N. Milwaukee St., Suite 200
Milwaukee, WI  53202
Telephone:  (414) 273-8474
Facsimile:  (414) 273-8476
E-mail:  edickinson@hrdclaw.com
E-mail:  ccrueger@hrdclaw.com

*Attorneys for Plaintiff*