IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| Dale R. Ludwick, on behalf of Herself and All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 15-00011-CV-W-DGK ) |
| Harbinger Group, Inc., et al., | ) ) |
| Defendants. | ) ) |

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

This is a putative class action seeking damages for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Pending before the Court is Defendants' Motion to Dismiss for Failure to State a Claim under Rule 12(b)(6) (Doc. 23). Because the matter before the Court can be decided upon the written motion and suggestions, the parties' request for oral argument is denied. *See* Local Rule 7.0(b) (granting request for oral argument is at the discretion of the Court). The Court finds that the McCarran-Ferguson Act bars Plaintiff's claims. Therefore, Defendants' motion is GRANTED.

**Standard**

A complaint may be dismissed if it fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In reviewing the adequacy of a complaint, a court assumes that the factual allegations in the complaint are true and construes them in the light most favorable to the plaintiff. *Data Mfg. Inc. v. UPS, Inc.*, 557 F.3d 849, 851 (8th Cir. 2009). While courts will accept plaintiff's factual allegations as true, a court must "reject conclusory

1

allegations of law and unwarranted inferences." *Silver v. H&R Block, Inc.*, 105 F.3d 394, 397 (8th Cir. 1997).

**Factual Background**

Plaintiff Dale R. Ludwick's ("Plaintiff") Complaint alleges the following facts, which the Court assumes to be true for purposes of resolving the motion to dismiss. Plaintiff names four Defendants: F&G Life Insurance Company ("F&G"), Harbinger Group, Inc. ("Harbinger"), Raven Reinsurance Company ("Raven Re"), and Front Street Re (Cayman), Ltd. ("Front Street Cayman").

Plaintiff Dale R. Ludwick and those similarly situated have purchased annuities[1] from Defendant F&G since April 6, 2011. Compl. 1 (Doc. 1). Defendant Harbinger acquired F&G (then named OM Financial Life Insurance Group) on April 6, 2011. *Id.* at ¶ 124-125. F&G was domiciled in Maryland, and became a domiciliary of Iowa on November 1, 2013. *Id.* at ¶ 27.

Plaintiff alleges that F&G, Harbinger, and Harbinger's chairman and CEO, Philip A. Falcone ("Falcone"), created a fraudulent accounting scheme to hide F&G's liabilities and artificially inflate F&G's reported assets. *Id.* at ¶ 7. This scheme ignored the Statutory Accounting Principles ("SAPs") promulgated by the National Association of Insurance Commissioners ("NAIC") designed to protect annuity holders and certify that F&G had assets sufficient to meet current and future annuity holder obligations. *Id.* at ¶¶ 3, 7. Harbinger and Falcone orchestrated a series of transactions using wholly-owned captive subsidiaries[2] and a

---

[1] Annuity insurance is an "agreement to pay the insured (or *annuitant*) for a stated period or for life." *Black's Law Dictionary* 920 (10th ed. 2014). The value of the annuity to a purchaser is the present value of the projected future stream of payments discounted to reflect, among other things, the risk of non-payment by the insurance company (Doc. 1 at ¶ 42).

[2] Captive insurance is defined as "[i]nsurance that a subsidiary provides to its parent company, usu. so that the parent company can deduct the premiums set aside as loss reserves." *Black's Law Dictionary*, *supra*, at 920.

reinsurance[3] company named Wilton Re to transfer F&G's liabilities from its financial statements. *Id.* at ¶ 8. Throughout 2011, 2012, and 2013, F&G created a false appearance of capital adequacy by transferring F&G liabilities to and among entities Raven Re, Front Street Cayman, and Wilton Re. *Id.* at ¶ 9. F&G also used these transactions to report its holdings of non-agency mortgage-backed securities in its admitted asset base at cost, rather than at their true market value. *Id.* at ¶ 11. Plaintiff contends that, absent these financial maneuvers, F&G would have had to report a negative statutory surplus after its acquisition by Harbinger. *Id.* at ¶ 14.

Specifically, Plaintiff alleges the following four financial maneuvers were fraudulently misrepresented in F&G's 2011, 2012, and 2013 annual reports. First, Plaintiff alleges the "Raven Re transaction" was fraudulent. In 2011, F&G formed Raven Re as a wholly-owned captive reinsurance company. *Id.* at ¶ 136. In 2012, F&G ceded millions of dollars in reserve credit liabilities to Raven Re. *Id.* at ¶ 166. This transaction increased F&G's reported surplus in 2012 and 2013. *Id.* at ¶¶ 162-66, 175-76. Plaintiff contends this transaction was not arm's-length, as required by the NAIC SAPs, because Raven Re had no independent ability to pay the reserve liability F&G ceded to it. *Id.* at ¶¶ 79, 161-66. The real purpose of this transaction was to allow F&G to use a letter of credit[4] facility as an admitted asset to reduce liabilities. *Id.* at ¶ 137-40, 164-65. F&G represented in its annual report that it followed all NAIC SAPs, yet the treatment of this letter of credit facility as an admitted asset actually did not follow the SAPs. *Id.* at ¶¶ 164-67.

---

[3] Reinsurance is "[i]nsurance of all or part of one insurer's risk by a second insurer, who accepts the risk in exchange for a percentage of the original premium." *Id.* at 1477.

[4] A letter of credit is an instrument under which the issuer agrees to honor a draft or other demand for payment made by a third party (the beneficiary), as long as the draft or demand complies with specified conditions, and regardless of whether any underlying agreement is satisfied. *Id.* at 923. There are multiple forms a letter of credit may take, depending on the underlying agreement of the parties. *See id.* at 923-24 (listing definitions for a "clean" letter of credit and an "irrevocable" letter of credit, among others).

3

Second, Plaintiff contends F&G's claim of Raven Re stock as an admitted asset to increase F&G's reported surplus ("Raven Re stock transaction") was fraudulent. *Id.* at ¶ 167. Defendant F&G claimed the stock had a positive value in 2012 and 2013 even though Raven Re was insolvent and its stock had no value. *Id.* This accounting practice inflated F&G's surplus and risk-based capital levels beyond what would have been reported had F&G followed the NAIC SAPs. *Id.* at ¶¶ 141-42, 164, 167.

Third, Plaintiff alleges Defendants had F&G enter into a large reinsurance transaction in 2012 with an affiliated entity in the Cayman Islands, Front Street Re ("Front Street Re transaction"). *Id.* at ¶¶ 168-73. Harbinger formed Front Street Re in 2012 and F&G subsequently ceded over $1 billion in liabilities to Front Street Re on December 31, 2012. *Id.* at ¶ 169. F&G claimed a reserve credit for liabilities transferred to Front Street Cayman, a wholly-owned subsidiary of Front Street Re. *Id.* at ¶ 170. However, no assets were transferred to Front Street Cayman or Front Street Re, as the reinsurance transaction was implemented on a funds withheld basis. *Id.* at ¶ 171. Through this transaction, F&G enhanced its report surplus and risk-based capital levels without transferring to Front Street Cayman actual and valuable assets proportionate to its transfer of liabilities. *Id.* at ¶ 172.

Finally, Plaintiff asserts that Defendants falsely inflated F&G's surplus and risk-based capital through two reinsurance transactions with Wilton Re ("Wilton Re transactions"). *Id.* at ¶¶ 147, 152-55. On April 8, 2011, Defendant F&G ceded $651 million of reserve liabilities and sent only $543 million in assets to Wilton Re, recognizing a net gain of $114 million. *Id.* at ¶ 147. In October of 2011, Defendants ceded $927 million in liabilities to Wilton Re and took the corresponding reduction in its reserve liabilities. *Id.* at ¶ 152. F&G sent only $427 million in assets and a negative ceding commission of $135 million to Wilton Re. *Id.* at ¶ 153. F&G

4

reported a $365 million gain in surplus following this transaction. *Id.* Plaintiff alleges that these transactions are an attempt to take advantage of "the fact that regulators typically never question reinsurance transactions with authorized and unaffiliated entities." *Id.* at ¶ 154. F&G could not claim reserve credits to reduce its liabilities for either of these transactions under the NAIC SAPs. Pl.'s Br. 11 (Doc. 31).

Plaintiff claims damages in the amount overpaid for annuities that were riskier and less valuable than represented and accrued account values lower than the values that would have been realized absent these transactions. *Id.* at 13. Plaintiff alleges an overpayment of $6,256 at the point of sale in September of 2013. *Id.*

## Discussion

The Complaint asserts the four transactions above violate two separate provisions of RICO, 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d). Defendants contend Plaintiff cannot maintain a RICO claim because, under the McCarran-Ferguson Act, Plaintiff's claim impermissibly interferes with state statutory and regulatory insurance schemes.

The McCarran-Ferguson Act states that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance…unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). In other words, the McCarran-Ferguson Act bars the application of a federal statute if: (1) the federal statute does not relate specifically to the business of insurance, (2) a state statute has been enacted to regulate the business of insurance, and (3) the federal statute would invalidate, impair, or supersede the state statute. *LaBarre v. Credit Acceptance Corp.*, 175 F.3d 640, 643-43 (8th Cir. 1999).

5

First, RICO does not specifically relate to the business of insurance. *Humana, Inc. v. Forsyth*, 525 U.S. 299, 307 (1999). Second, Missouri and Iowa have enacted comprehensive statutory schemes to regulate the business of insurance.[5] *See* Mo. Rev. Stat. § 375.001 *et seq.*; Iowa Code § 505 *et seq.*; *Saunders v. Farmers Ins. Exch.*, 537 F.3d 961, 965 (8th Cir. 2008) ("Like most States, Missouri thoroughly regulates the business of insurance."). The remaining question is whether the application of RICO would "invalidate, impair, or supersede" the statutory schemes of Missouri and Iowa.

Plaintiff first contends that these RICO claims would not intrude upon the states' insurance regulation schemes because Plaintiff's claim is premised on Defendants' false representation of compliance with the NAIC SAPs, not the regulatory decisions regarding the underlying reinsurance transactions. Second, Plaintiff asserts there is no preemption when state common law provides causes of action and remedies for the fraudulent acts that exceed RICO's treble damages. Third, Plaintiff contends the McCarran-Ferguson Act is inapplicable to any Defendant not subject to regulation under the Iowa and Missouri insurance codes. For the reasons set forth below, the Court rejects these arguments and finds that Plaintiff's RICO claims are preempted by the McCarran-Ferguson Act.

## I. Plaintiff's RICO claims would intrude upon the states' insurance regulation schemes.

First, Plaintiff argues that these RICO claims would not require the Court to intrude upon the states' insurance regulation schemes because she is simply challenging Defendants' "false representation of compliance with SAP standards in calculating its surplus and risk-based capital, thereby misrepresenting F&G's financial condition and fraudulently inducing Plaintiff to acquire

---

[5] Plaintiff does not argue that Maryland law applies, though F&G was domiciled in Maryland at the time of the transactions in question. Plaintiff's only reference to Maryland is on page four of her Brief in Opposition, where she cites to Maryland regulations requiring that annual statements be prepared in accordance with the NAIC SAPs. Pl.'s Br. 4 n.2 (Doc. 31); *see* Md. Code Regs. 31.04.04.01.A(3)(a).

6

annuities that were…worth far less than what [Plaintiff] paid" (Doc. 31 at 2). Plaintiff disclaims a challenge to the legitimacy of the underlying reinsurance transactions. *Id.* However, Plaintiff spends a majority of the Complaint analyzing the propriety of these transactions. *See, e.g.,* Doc. 1 at ¶¶ 135-44; 151-57; 161-67. Because the NAIC SAPs are so closely connected with these states' statutory and regulatory schemes for insurance, Plaintiff's claims would require the Court to analyze the underlying reinsurance transactions and subsequent regulatory approval of the transactions.

The NAIC Statutory Accounting Principles, where implemented, are incorporated into state regulations in a substantially similar manner and are then followed by state regulators in approving the types of reinsurance transactions at issue here. *See generally* Iowa Admin. Code 1-55-1 to 191-17.5; Md. Code Regs. 31.05.07.01-31.05.07.05; Mo. Code Regs. Ann. tit. 20, §§ 200-2.300; Nat'l Ass'n of Ins. Comm'rs, *Statutory Accounting Principles (SAP)* (Sept. 24, 2015), http://www.naic.org/cipr_topics/topic_statutory_accounting_principles.htm ("[T]he [NAIC Accounting Practices and Procedures] Manual does not preempt state legislative and regulatory authority, therefore state variations may occur in accordance with prescribed or permitted practices."). The company's domicile serves as primary regulator in approving reinsurance transactions. *See* Iowa Code § 521A.5(1)(a) (requiring that the insurer's "surplus as regards policyholders…be reasonable in relation to the insurer's outstanding liabilities and adequate to its financial needs" in material transactions between an insurer and an affiliate); Md. Code Ann., Ins. §§ 7-702, 7-703 (outlining the standards for transactions within insurance holding company systems and requiring commissioner approval of reinsurance transactions). The financial statement credit received for a reinsurance transaction is also controlled by the domiciliary regulator. *See* Iowa Code § 508.11.43 (requiring insurance companies to file an annual

statement that includes "[a]ll other information as required by the national association of insurance commissioners' annual statement blank," with all financial information reflected in the annual report to be "kept and prepared in accordance with accounting practices and procedures prescribed by the commissioner"); *id.* § 521B.102 (titled "Credit allowed certain domestic ceding insurers"); Md. Code Ann., Ins. § 5-904 (describing the credit allowed for reinsurance transactions); Md. Code Regs. § 31.05.08.03 (describing requirements for becoming an accredited reinsurer); *id.* § 31.05.08.07 (describing effects of suspension or revocation of accreditation of a reinsurer); *cf.* Mo. Rev. Stat. § 375.246 (addressing the allowance of reinsurance as an asset or reduction from liability for a *domestic* ceding insurer); *id.* § 375.1028 (exempting foreign insurers filing audited financial reports in another state with substantially similar requirements from most of Missouri's financial reports requirements). In the event a reinsurance transaction proves inadequate under the regulatory schemes, the state insurance commissioner or director is authorized to take remedial action. *See* Iowa Code § 521E.2(5) (allowing the commissioner to adjust inaccurate risk-based capital reports filed by domestic insurers); *id.* § 521E.4-6 (requiring the commissioner to examine an insurer's assets and liabilities or take corrective action in the event the insurer's total adjusted capital falls below specific risk-based capital levels); Md. Code Ann., Ins. §§ 4-306 to 4-309 (authorizing the commissioner to take specific remedial action based upon the risk-based capital level of an insurer); Mo. Rev. Stat. § 375.938 (authorizing the director of insurance to examine and investigate the affairs of any insurer to determine whether the insurer is engaged in any unfair or deceptive act or practice prohibited by Missouri law).

Here, Plaintiff asks the Court to parse these reinsurance transactions and F&G's accounting of the transactions in the annual reports to determine if F&G misrepresented its

8

financial condition under the NAIC Statutory Accounting Principles. In doing so, this Court would be required to perform the same task as the insurance regulators in Iowa, Maryland, and Missouri–specifically, to determine the propriety of the credit allowed for each reinsurance transaction in F&G's annual reports. Doing so would intrude upon the comprehensive regulatory schemes put into place by the states. *See Saunders*, 537 F.3d at 968 (allowing courts to rewind determinations made by state insurance directors would constitute a complete overlap with the state agency's delegated tasks).

> II. **The presence of common law remedies, including punitive damages, does not save Plaintiff's RICO claim from reverse preemption.**

Plaintiff next argues that the presence of common law claims of action and remedies in Missouri and Iowa complement her federal claim and save it from reverse preemption[6] under McCarran-Ferguson. There is a divergence in views among the circuits regarding the application of *Humana* where a private right of action is unavailable under a state's insurance laws. Plaintiff cites cases from the Third, Fourth, and Tenth Circuits in support of her argument. This Court will follow Eighth Circuit precedent, which finds RICO claims reverse preempted where a private right of action under the state insurance code is unavailable.

In *Humana*, plaintiffs argued that their insurance company privately negotiated with healthcare companies for medical services discounts and failed to pass those discounts down to the beneficiaries. *Humana*, 525 U.S. at 303-04. The Court found McCarran-Ferguson did not bar plaintiffs' claim because RICO's private right of action and damages provision complemented Nevada's statutory and common law claims for relief. *Id.* at 313.

---

[6] Reverse preemption is "a form of inverse preemption that prevents a generally applicable federal law from inadvertently invalidating, impairing, or superseding state laws enacted to regulate the business of insurance." *Riverview Health Inst. LLC v. Medical Mutual of Ohio*, 601 F.3d 505, 511 n.1 (6th Cir. 2010); *see also Humana*, 525 U.S. at 306-07.

9

Shortly thereafter, the Eighth Circuit in *LaBarre* recognized that Minnesota permitted only administrative recourse for violations of Minnesota insurance law and, unlike RICO, did not provide a private cause of action. *LaBarre,* 175 F.3d at 643. The Eighth Circuit concluded that "the McCarran-Ferguson Act barred the application of RICO to an insurer which allegedly violated [Minnesota insurance law] because 'the extraordinary remedies of RICO would frustrate, and perhaps even supplant, Minnesota's carefully developed scheme of regulation.'" *Id.*

Another case from this district analyzed the differences between the *Humana* and *LaBarre* decisions and found the lack of a private cause of action for violations of the Minnesota Unfair Claims Practices Act to be the only distinction between Minnesota and Nevada law. *Farthing v. United Healthcare of the Midwest, Inc.,* No. 98-CV-4262-GAF, 2000 U.S. Dist. LEXIS 21994 (W.D. Mo. Feb. 29, 2000) (Fenner, J.). It held that Missouri law was similar to Minnesota law in that: (1) there is no private cause of action for violations of insurance statutes and regulations; (2) insurance companies are still subject to common law claims for fraud, breach of contract, and breach of duty of good faith and fair dealing; and (3) Missouri law allows for an award of punitive damages. *Id.* at *12.

The Court is not persuaded by Plaintiff's argument that the Eighth Circuit's decision in *Saunders* effectively overruled its holding in *LaBarre*. Plaintiff cites *Saunders* for the proposition that the availability of a common law right of action preserves her RICO claim—a reading that would effectively overrule the holding in *LaBarre*. Plaintiff emphasizes *Saunders'* holding that because "neither the Missouri insurance laws *nor Missouri common law* provides a private right of action for unfairly discriminatory rates," transferring their administration from the state agency to the federal court would obviously interfere with the administration of the state

10

law. 537 F.3d at 968 (emphasis added). However, *Saunders* involved a right that was "solely a creature of the insurance statutes," and the lack of both statutory and common law rights of action served only to reinforce the Court's finding that the agency had primary authority in the matter. *Id.* Hence, there is no indication the Eight Circuit in *Saunders* intended to overrule the precedent set in *LaBarre*.[7]

Here, both Iowa and Missouri provide common law remedies,[8] including punitive damages,[9] for fraudulent conduct. Insurance companies may still be subject to these common law claims.[10] In fact, both states include remedy preservation clauses in their unfair trade practices acts. Iowa Code § 507B.8 ("No order of the commissioner under this chapter or order of a court to enforce the same shall in any way relieve or absolve any person affected by such order from any liability under any other laws of this state."); Mo. Rev. Stat. § 375.944.4 ("No order of the director under section 375.942 or order of a court to enforce the same shall in any way relieve or absolve any person affected by such order from any liability under any other laws of this state."). Because the lack of a private right of action under the states' insurance codes is dispositive, the availability of common law remedies does not save Plaintiff's RICO claim from reverse preemption under Eighth Circuit precedent.

---

[7] Panel decisions may only be overruled en banc. *See Cottier v. City of Martin*, 604 F.3d 553, 556 (8th Cir. 2010) (en banc) ("When sitting en banc, the court has authority to overrule a prior panel opinion, whether in the same case or in a different case."); *Liberty Mut. Ins. Co. v. Elgin Warehouse & Equip.*, 4 F.3d 567, 571 (8th Cir. 1993) ("In this circuit only an en banc court may overrule a panel decision.").

[8] *See, e.g., Utica Mut. Ins. Co. v. Stockdale Agency*, 892 F. Supp. 1179, 1192-93 (N.D. Iowa July 10, 1995) (listing elements of fraudulent misrepresentation claim in Iowa); *Heberer v. Shell Oil Co.*, 744 S.W.2d 441, 443 (Mo. 1988) (en banc) (listing the elements of a Missouri common law claim for fraudulent misrepresentation).

[9] *See, e.g., Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 745 (Iowa 2009) ("Punitive damages may be awarded in an action for fraud when, in conjunction with the fraud, the defendant acts with legal malice."); *Lewellen v. Franklin*, 441 S.W.3d 136, 145 (Mo. 2014) (en banc) (finding Missouri statutory punitive damages cap unconstitutional as applied to claims to which the right to jury trial attaches at common law and affirming propriety of punitive damages award for fraudulent misrepresentation claim).

[10] However, Plaintiff fails to cite a Missouri or Iowa case in which a common law claim for fraud was allowed to proceed to challenge transactions approved by state insurance regulators.

11

### III. The McCarran-Ferguson Act applies to Defendants' activities and Missouri and Iowa insurance codes address the fraudulent misrepresentations alleged by Plaintiff.

Finally, Plaintiff argues the McCarran-Ferguson Act is inapplicable to Defendants not subject to regulation under Iowa's and Missouri's insurance codes. Plaintiff contends that, apart from F&G, Defendants make no showing that they are regulated by Iowa or Missouri insurance regulators. This argument is unavailing.

Even if an insurance company is not subject to state insurance laws, the McCarran-Ferguson Act can apply to its *activities* governed by state insurance law. *LaBarre*, 175 F.3d at 643 ("As pleaded, CAC's alleged *activities* are not governed by Minnesota's insurance statutes and do not involve the business of insurance within the framework of the McCarran-Ferguson Act." (emphasis added, internal citations omitted)).

Here, Defendants' activities in furtherance of Plaintiff's alleged scheme are regulated by the state insurance codes. Three of the challenged transactions are captive, or affiliate, reinsurance transactions—the Raven Re transaction, the Raven Re stock transaction, and the Front Street Re transaction. In both Maryland and Iowa, captive transactions must be reviewed by the insurance commissioner of the ceding company's state of domicile. *See* Iowa Code § 521A.5 (concerning standards for "[m]aterial transactions by registered insurers with their affiliates"); Md. Code Ann., Ins. § 7-702 (enumerating standards for transactions within insurance holding company systems); *id.* § 7-703(e) (stating the Commissioner shall take into consideration compliance with § 7-702 and any potentially adverse effect on the interests of policyholders in reviewing transactions, including affiliate transactions). Because Defendants' activities, namely these challenged affiliate reinsurance transactions, are governed by the

12

insurance codes of the ceding insurer's state of domicile, the McCarran-Ferguson Act preempts Plaintiff's RICO claim against them.

Similarly, two challenged transactions between F&G and Wilton Re are governed by state insurance law. Though Wilton Re is not a party to this suit, Plaintiff challenges Harbinger's participation in the alleged fraudulent scheme, which includes these unaffiliated reinsurance transactions. The insurance codes of Iowa and Maryland outline requirements for entering into unaffiliated reinsurance transactions. *See* Iowa Code § 521.3 ("Any company proposing to…enter into any reinsurance contract with another company shall file a plan and an application in support of the plan with the commissioner. The plan shall set forth the terms of the proposed contract…along with any other information requested by the commissioner."); Md. Code Ann., Ins. § 5-904 (allowing an insurer to reinsure all or part of a particular risk and setting forth the financial statement credits allowed for certain types of reinsurance transactions). Because these challenged activities are governed by the insurance codes of the ceding insurer's state of domicile, the McCarran-Ferguson Act preempts Plaintiff's claims.

## Conclusion

Because the McCarran-Ferguson Act preempts Plaintiff's RICO claims, the Court need not address whether Plaintiff has plausibly pled these claims. Plaintiff's complaint fails to state a claim upon which relief can be granted and Defendants' Motion to Dismiss (Doc. 23) is GRANTED.

**IT IS SO ORDERED.**

Dated: February 12, 2016     /s/ Greg Kays
                             GREG KAYS, CHIEF JUDGE
                             UNITED STATES DISTRICT COURT

13

Case 4:15-cv-00011-DGK   Document 60   Filed 02/12/16   Page 13 of 13